IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS,<br>    Plaintiff, | §<br>§<br>§ | |
| v. | §<br>§ | |
| YSLETA DEL SUR<br>PUEBLO, the TRIBAL<br>COUNCIL, and the<br>TRIBAL GOVERNOR<br>CARLOS HISA or his<br>SUCCESSOR,<br>    Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§ | EP-17-CV-179-PRM |

## ORDER REGARDING
## MAGISTRATE'S REPORT AND
## RECOMMENDATION AND PLAINTIFF'S
## APPLICATION FOR PRELIMINARY INJUNCTION

On this day, the Court considered the "Report and

Recommendation of the Magistrate Judge on the State of Texas's

Motion for a Preliminary Injunction" (ECF No. 64) [hereinafter "R&R"],

filed on January 29, 2018, the State of Texas's [hereinafter "Plaintiff" or

"State" or "State of Texas"] "Objections to Report and Recommendation

Pursuant to Federal Rule of Civil Procedure 72(b)" (ECF No. 68)

[hereinafter "Objections"], filed on February 12, 2018, Ysleta del Sur

Pueblo, the Tribal Council, and the Tribal Governor Carlos Hisa's

[hereinafter collectively referred to as "Defendants"] "Response to

Plaintiff's Objections to Report and Recommendation" (ECF No. 71)

[hereinafter "Response to Objections"], filed on February 26, 2018, and Plaintiff's "Reply in Support of Objections" (ECF No. 73), filed on March 5, 2018, in the above-captioned cause. In conjunction therewith, the Court considered Plaintiff's "Application for Preliminary Injunction" (ECF No. 9) [hereinafter "Application"], filed on August 15, 2017, Defendants' "Response in Opposition to Plaintiff's Application for Preliminary Injunction" (ECF No. 17) [hereinafter "Response to Application"], filed on September 12, 2017, and Plaintiff's "Reply in Support of Application for Preliminary Injunction" (ECF No. 18) [hereinafter "Reply Supporting Application"], filed on September 18, 2017, in the above-captioned cause.

## I.    BACKGROUND

### A.    Factual Background

As described in the Court's recent Order Denying Defendants' Motion to Dismiss (ECF No. 76), this case is the latest iteration of a long-running dispute between Plaintiff and Defendants regarding enforcement of Texas gaming law on the Ysleta del Sur Pueblo [hereinafter "Pueblo" or "Tribe"] reservation. While it is unnecessary to delve into a comprehensive history of the litigation and factual background, the Court will recite the facts relevant to analyzing the R&R and reaching a conclusion on the Application for Preliminary Injunction.

In 1987, the United States enacted the Restoration Act ("the Act"), which "restored federal tribal status to the Ysleta Del Sur Pueblo" from the State of Texas. Am. Compl. 3, Aug. 15, 2017, ECF No. 8. The Act delineates the nature of the federal trust relationship and contains provisions regarding, inter alia, federal recognition of the Tribe, the rights and privileges of the Tribe (including eligibility for federal services and assistance), the relationship between federal, state, and tribal authority, and permanent physical improvements on the reservation. *See generally* Ysleta del Sur Pueblo and Alabama and Coushatta Indian Tribes of Texas Restoration Act, Pub. L. No. 100–89, 101 Stat 666 (1987). Most importantly for purposes of this case, the Act governs "Gaming Activities" conducted on the reservation [hereinafter "Pueblo gaming"]. *Id.* at § 107.

Section 107 of the Act contains the provisions relevant to deciding whether to grant a preliminary injunction. Section 107(a), in pertinent part, provides that:

> All gaming activities which are prohibited by the laws of the State of Texas are hereby prohibited on the reservation and on lands of the tribe. Any violation of the prohibition provided in this subsection shall be subject to the same civil and criminal penalties that are provided by the laws of the State of Texas.

Section 107(c) provides that "the courts of the United States shall

have exclusive jurisdiction over any offense in violation of subsection (a) [i.e., the section prohibiting all gaming activities prohibited by the State of Texas] . . . ."

The effect of subsections (a) and (c) of the Act is to federalize Texas gaming law, which currently operates "as surrogate federal law on the Tribe's reservation in Texas." *Ysleta del Sur Pueblo v. State of Tex.*, 36 F.3d 1325, 1334 (5th Cir. 1994). Essentially, any activity prohibited pursuant to Texas law is prohibited pursuant to federal law. While the State of Texas has many laws prohibiting gambling, the State does not consider all gaming activity to be unlawful gambling. Thus, "[n]ot all gaming activities are prohibited to the Tribe, only those gaming activities that are prohibited by Texas law to private citizens and other organizations. As such, the Tribe may participate in legal gaming activities." *Texas v. del Sur Pueblo*, 220 F. Supp. 2d 668, 707 (W.D. Tex. 2001), *modified* (May 17, 2002), *aff'd*, 31 F. App'x 835 (5th Cir. 2002), *and aff'd sub nom. State of Texas v. Pueblo*, 69 F. App'x 659 (5th Cir. 2003), *and order clarified sub nom. Texas v. Ysleta Del Sur Pueblo*, No. EP-99-CA-320-H, 2009 WL 10679419 (W.D. Tex. Aug. 4, 2009) [hereinafter "Judge Eisele Order"]. Accordingly, the current dispute involves whether Defendants' operation of "electronic bingo" machines violates Texas gaming law and, thus, whether it violates federal law pursuant to the Act. Am. Compl. 6.

Specifically, Plaintiff alleges that Defendants are operating a "brazen form of illegal lottery" on their reservation, and therefore that the Tribe is in violation of the Act. Appl. 2. Plaintiff presents evidence of a physical inspection of the Speaking Rock Entertainment Center ("Speaking Rock"), which is operated by Defendants. The physical inspection, which was submitted to the Court in the form of a video exhibit, revealed electronic bingo machines that "stood in rows in a dim, casino-like atmosphere, loud with the electronic bells, whistles, and theme songs of the machines and illuminated by their flashing lights." Appl. 4. The inspection further revealed that these machines announced "their maximum respective jackpots in blinking, marquis-style lights," that they were located near the facility's "large bar," that customers could "insert cash directly into the machine," and that the machines were available "to the public 24 hours a day, 7 days a week." *Id.* at 4–5. Finally, Plaintiff describes (and the video evidence supports) how the gameplay on the machines appears to mimic "slot machines"[1] rather than the game of bingo. *Id.* at 5. In essence, Plaintiff seeks injunctive relief to prohibit Defendants from offering these machines

---

[1] Because Plaintiff does not give a description of what it believes a "slot machine" is, the Court will recognize the dictionary definition of this term as either: "a machine whose operation is begun by dropping a coin into a slot"; or "an originally coin-operated gambling machine that pays off according to the matching of symbols on wheels spun by a handle[.]" *Slot Machine*, Merriam-Webster Online Dictionary 2018.

because the State believes, due to the machines' strong resemblance to illegal slot machines, that the Tribe is violating Texas gaming law.

## B. Procedural Background

In 2002, Plaintiff obtained a permanent injunction "prohibiting the Tribe from engaging in illegal gambling in violation of Chapter 47 of the Texas Penal Code." Appl. 3. The parties have litigated the scope and applicability of the 2002 injunction before multiple judges throughout the last fifteen years under cause number 3:99-CV-320. In 2016, when Plaintiff learned of the machines at issue here, it filed a motion seeking contempt of the 2002 injunction. *Id.* However, Judge Cardone ruled that the motion was moot after Plaintiff informed the court that it had agreed with Defendants to conduct a voluntary visual inspection of the premises before moving forward with its suit. *See* Order 2, *Texas v. del Sur Pueblo,* 3:99-CV-320-KC (ECF No. 625), Mar. 10, 2017. Judge Cardone also expressed to the parties that she believed the proper "mechanism for addressing violations" of the Restoration Act was for the State of Texas to bring a new action for injunctive relief in federal court. *Id.* Thus, upon completing the inspection and believing Defendants were in violation of the Restoration Act, Plaintiff filed its Application.

Acting pursuant to its authority in 28 U.S.C. § 636, the Court referred Plaintiff's Application to a Magistrate Judge on September 11, 2017. The Magistrate Judge then filed an R&R regarding a disposition on the Application on January 29, 2018.

## C.   The Magistrate Judge's Recommendation

The Magistrate Judge [hereinafter "Magistrate"] recommends denying the Application because he suggests the Court lacks authority to issue an injunction in this situation. Specifically, the Magistrate relies on a general prudential principle that federal "courts have no power to enjoin the commission of a crime." R&R 3 (citing *United States v. Jalas*, 409 F.2d 358 (7th Cir. 1969)). The Magistrate recognizes only three exceptional situations that permit federal courts to enjoin criminal activity: national emergencies, widespread public nuisances, and where a specific federal statutory grant of power to issue an injunction exists. *Id.* at 4 (citing *Jalas*, 409 F.2d at 360). Concluding that Pueblo gaming is not a widespread public nuisance or a national emergency, and that no specific statutory grant of power authorizes the Court to issue an injunction here, the Magistrate suggests that the Court lacks the power to issue an injunction. The Magistrate made no factual findings regarding the request for preliminary injunction.

Finally, the Magistrate expresses "doubt" that subject-matter jurisdiction lies over this dispute.  R&R 9.

After due consideration, the Court rejects the reasoning in the R&R.  However, for the reasons explained in Section III, *infra*, the Court, nevertheless, will deny the Application.

## II.    THE REPORT AND RECOMMENDATION

### A.    Standard of Review

A district court may, on its own motion, refer a pending matter to a United States Magistrate Judge for a report and recommendation.  28 U.S.C. § 636(b)(1)(B).  Once the Magistrate Judge enters a report and recommendation, any party may contest the report by filing written objections.  *Id.* at § 636(b)(1)(C).  If a party chooses to lodge objections, the district judge must then make a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.*; *see also* W.D. Tex. Civ. R. App. C, Rule 4(b).

## B. The Court Rejects the Reasoning in the R&R

Because Plaintiff objects to the fundamental premise of the R&R—that the Court lacks authority to issue an injunction here—the Court must review the entirety of the R&R's suggestions de novo. Like Plaintiff, the Court disagrees that it lacks the power to grant an injunction in this case. Instead, the Court holds that the rule prohibiting courts from enjoining criminal activity is inapplicable here. Further, even if it were applicable, the specific-grant-of-authority exception is satisfied, and the Court therefore has authority to issue an injunction. Finally, the Court holds that Plaintiff properly invoked subject-matter jurisdiction in this case. The Court will discuss these issues in turn.

### i. *The Prohibition on Enjoining Criminal Activity is Inapplicable*

The R&R relies on *United States v. Jalas* for the rule that the Court has no power to issue an injunction here.[2] 409 F. 2d 358 (7th Cir.

___

[2] Defendants' Response to Plaintiff's Objections conspicuously omits any mention of *Jalas* or the prohibition against enjoining criminal activity. Thus, it is unclear whether Defendants even support the application of the rule in this case. Instead, Defendants' Response to Objections focuses on Plaintiff's alleged failure to adequately analyze the four injunction factors, contends that the attorney general lacks capacity to bring this claim, and argues that sovereign immunity bars this suit. *Id.* Defendants' sole endorsement of the rationale in the R&R is only loosely

1969). In *Jalas*, the Government sought to enjoin Clarence Jalas from running for and serving in a leadership position of a labor union because that official had previously pled guilty to accepting a bribe. *Id.* The Government asserted that if Jalas took office, he would be criminally liable pursuant to 29 U.S.C. § 504 (the Labor-Management Disclosure Reporting Act), which institutes criminal penalties for serving as an officer in a labor union with a previous bribery conviction. *Id.* at 359. In declining the government's application for an injunction, the Court held that it had no power to enjoin the commission of a crime except in cases of "[n]ational emergencies, widespread public nuisances, and where a specific statutory grant of power exists" [hereinafter *"Jalas*

related to the actual rationale. Piggybacking off of the R&R's textualist interpretation of § 107(c) of the Restoration Act, Defendants make an entirely new argument about whether the Restoration Act provides Plaintiff with a private right of action to bring suit. Resp. to Obj. 5–9. This argument is completely unmoored from the prohibition against enjoining criminal activity on which the R&R relies. Regardless of the merits of their multiple new arguments, these new issues are entirely outside the scope of the R&R or Plaintiff's Objections thereto. Thus, they are not properly before the Court and the Court declines to address them here. *See United States v. Bonilla-Mungia*, 422 F.3d 316, 319 (5th Cir. 2005) ("[W]e will not consider new arguments first raised by an appellee in supplemental briefing on unrelated issues."); *Finley v. Johnson*, 243 F.3d 215, 219 n.3 (5th Cir. 2001) ("[I]ssues raised for the first time in objections to the report of a magistrate judge are not properly before the district judge.").

10

Rule"]. *Id.* at 360. Concluding that none of those exceptions was satisfied, the Court noted that the "sole remedy for the complained-of-wrong is criminal prosecution," and remanded the case to the district court with instructions to dismiss. *Id.*

The *Jalas* rule is inapposite where, as here, the relevant federal statute under which the plaintiff brings suit provides for both civil and criminal remedies. The general prohibition against enjoining criminal activity has been consistently limited to situations where the statute under which the plaintiff seeks relief is "patently a criminal statute contemplating proceeding by indictment or information." *Id.* For example, in the context of Indian law, the Eighth Circuit rejected the R&R's approach in analogous circumstances involving the United States Government and the Santee Sioux Tribe. *See United States v. Santee Sioux Tribe of Nebraska*, 135 F.3d 558, 565 (8th Cir. 1998). There, the court overturned a district court order holding that the federal Government had no power to sue based on the *Jalas* rule. The Santee Tribe was governed by the Indian Gaming Regulatory Act ("IGRA"), which, similar to the Restoration Act, made any violation of a Nebraska state gaming law a violation of the IGRA. *Id.* In rejecting the applicability of *Jalas*, the court relied on the fact that the IGRA was

11

both criminal and civil in nature because it incorporated "Nebraska civil case law authorizing injunctive relief[.]" *Id.* Thus, the court concluded that "although potentially subject to criminal prosecution by the United States under the provisions of the IGRA, this activity is likewise subject to injunctive relief pursuant to applicable Nebraska law" and therefore that "the District Court should have enjoined [the activity] pursuant to Nebraska law."[3] *Id.*

Outside of the Indian law context, courts have reached the same conclusion: the *Jalas* rule does not apply to an activity subject to both criminal and civil remedies. *See United States v. Cappetto*, 502 F.2d 1351, 1357 (7th Cir. 1974) ("[A]cts which may be prohibited by Congress may be made the subject of both criminal and civil proceedings . . . . A civil proceeding to enjoin those acts is not rendered criminal in character by the fact that the acts also are punishable as crimes."); *Airlines Reporting Corp. v. Barry*, 825 F.2d 1220, 1224 (8th Cir. 1987) ("No court, state or federal, is barred from enjoining activity that causes or threatens injury to property merely because the activity, in addition

---

[3] The R&R distinguishes *Santee* in its explanation of why the activity in this case does not constitute a widespread public nuisance. R&R 8. However, the R&R does not discuss *Santee*'s holding to the extent it renders *Jalas* inapplicable in this case. Thus, the distinctions mentioned in the R&R do not serve to distinguish this case.

to being tortious, is a violation of the criminal law."); *United States v.*

*Prof'l Air Traffic Controllers Org. (PATCO)*, 653 F.2d 1134, 1142 (7th

Cir. 1981) (holding that merely because "affirmative acts or omissions

proscribed by a civil statute are also subject to criminal sanctions [it]

does not ipso facto convert the civil proscription into criminal activity").

Further, where a statute expressly authorizes injunctive relief,

"the existence of criminal or other legal sanctions d[oes] not require that

the district court deny the requested injunctive relief." *United States v.*

*Buttorff*, 761 F.2d 1056, 1064 (5th Cir. 1985).

Here, § 107 of the Restoration Act, unlike the relevant statute in

*Jalas*, is not "patently a criminal statute contemplating proceeding by

indictment or information."[4] Instead, the election of remedies—

---

[4] The R&R provides insufficient rationale for its conclusion that "the Restoration Act grants courts only limited *criminal* jurisdiction over gaming crimes that the Pueblo" commits, and that Texas state courts retain exclusive jurisdiction over any civil actions related to Pueblo gaming activity. R&R 5. Although not stated explicitly in the R&R, the Magistrate apparently read the grant of federal jurisdiction over "offenses" in violation of the Act as applying exclusively to criminal actions, not civil actions. *See* Nov. 13, 2017, Hr'g Tr. (ECF No. 50) 43:21–45:17. That is, only a federal prosecutor—the entity responsible for enforcing federal criminal law—may seek the "civil and criminal penalties" mentioned in the statute. R&R 9. However, as explained in more detail *infra*, reading the term "offense" as only applying to criminal actions by a prosecutor ignores the command in the second sentence of § 107(c). That sentence provides that "nothing in this

including criminal and civil penalties—is reserved to the party bringing suit. This is evident from the Act's express provision that any violations "shall be subject to the same civil and criminal penalties that are provided by the laws of the State of Texas." Restoration Act § 107(a). The laws of the State of Texas make certain gaming activity punishable by criminal penalties, see Tex. Penal Code Chapter 47, or subject to abatement/injunction as a nuisance, which includes civil penalties, see Tex. Civ. Prac. & Rem. Code § 125.0015 (defining a nuisance, for which the attorney general may seek injunctive relief, as "gambling, gambling promotion, or communicating gambling information as prohibited by the Penal Code"). Thus, the Restoration Act allows the party seeking relief to elect either criminal or civil penalties, including an injunction. Moreover, § 107(c) specifically references the State's ability to bring an injunction. Regardless of whether this provision is sufficiently

---

section shall be construed as precluding the State of Texas" from pursuing an injunction against gaming activities. Construing the word "offense" so narrowly that it undermines the State's ability to apply for an injunction contradicts the provision specifically directing courts not to construe the statute that way. Consistent with the command in the statue, the Court reads the term "offense" more broadly as referring to any act that violates, is inconsistent with, or fails to comply with the prohibition on gaming activities in subsection (a). Thus, the statute grants exclusive jurisdiction over disputes between the State of Texas and the Tribe regarding violations or failures to comply with subsection (a).

14

authoritative to confer jurisdiction, the drafters obviously contemplated the State's ability to seek injunctive relief, making it unlikely that they intended the Act's provisions to be limited to criminal enforcement. Thus, the Act is not strictly a criminal statute like the statute in *Jalas*, and the Court retains power to enjoin violations of the Act.

### ii. *Even if the Prohibition on Enjoining Criminal Activity did Apply, the Restoration Act Provides a Specific Statutory Grant of Power*

Even assuming arguendo that the prohibition against enjoining the commission of a crime is applicable here, the Court disagrees with the Magistrate that there is no specific grant of statutory authority to issue an injunction. *Jalas* noted exceptions to the prohibition on enjoining criminal activity where there is a national emergency, widespread public nuisance, or a specific grant of statutory power to grant an injunction.[5] 409 F.2d at 360. The Magistrate suggests that

---

[5] The Court notes that the prohibition against enjoining criminal activity has had many historical exceptions, and is not strictly limited to the three mentioned in *Jalas*. *See, e.g., Seifert v. Buhl Optical Co.*, 268 N.W. 784, 787 (1936) ("Suit may be brought by parties engaged in a profession or business to enjoin unfair trade and practice which would be injurious to their interests, and the fact that such practices are punishable by criminal penalties is immaterial."); *Dworken v. Apartment House Owners' Ass'n of Cleveland*, 176 N.E. 577, 580 (1931) (allowing private suit to enjoin the unlicensed practice of law); *In re Wood*, 194 Cal. 49, 55, 227 P. 908, 910 (1924) ("[W]here property rights

none of these three exceptions applies here, and accordingly recommends denying the Application because the Court has no authority to issue an injunction.

In analyzing the specific-grant-of-jurisdiction exception, the Magistrate focuses exclusively on § 107(c) of the Act.[6] That section provides that "nothing in this section shall be construed as precluding the State of Texas from bringing an action in the courts of the United States to enjoin violations of the provisions of this section." The Magistrate, though admitting that "a cursory reading of [this provision] appears to authorize Texas to seek injunctive relief in federal court,"

---

are endangered, the fact that the acts are criminal will not prevent a court of equity from exercising its jurisdiction."). Indeed, even the Fifth Circuit recognizes a much broader exception to the rule for circumstances where "the prosecution of a criminal charge is not an adequate remedy . . . ." *Buttorff*, 761 F.2d at 1063. The Magistrate, in discussing only the limited exceptions mentioned by *Jalas*, failed to grapple with the broader exceptions recognized in this circuit and historically in other jurisdictions. Specifically, considering that courts consistently decline to apply this rule in the unique context of Indian gaming, the Magistrate failed to analyze whether an exception might be appropriate here.

[6] The R&R provides no analysis of whether § 107(a) provides a specific grant of power for the Court to issue an injunction. That section states that violations of the Act "shall be subject to the same civil and criminal penalties that are provided by the laws of the State of Texas." Regardless of § 107(c), this provision appears to indicate Congress's intent to allow federal courts to grant civil relief.

16

suggests that § 107(c) does not provide such authorization. Instead, adopting a strict textualist interpretation, the Magistrate suggests that the "nothing shall preclude" language is not an affirmative grant, but merely a statement that the statute should not be read to interfere with some other affirmative grant that Congress could theoretically provide if it so desired. *See* R&R 6 ("Not preventing injunctive relief is not the same as affirmatively authorizing it.").

However, the Fifth Circuit has squarely held that the Restoration Act *does* contain a specific grant of power for federal courts to enjoin violations of its gaming provision. *See Ysleta del Sur Pueblo v. State of Tex.*, 36 F.3d 1325, 1334 (5th Cir. 1994). In *Ysleta*, the Fifth Circuit was faced with the question of whether the IGRA, which was passed after the Restoration Act, impliedly repealed the Restoration Act. *Id.* at 1335. Before it could decide which statute applied, the court had to find that the two statutes were in conflict. *Id.* at 1334. In determining that the two statutes were incompatible, the court found it "significant" that the Restoration Act "establishes a procedure for enforcement of 107(a) which is fundamentally at odds with the concepts of IGRA." *Id.* at 1334. Specifically, it concluded that the Restoration Act authorizes the State of Texas "to file suit in a federal court to enjoin any violation by

17

the Tribe of the provisions of § 107(a)[,]" which constitutes a "fundamentally different regime[ ]" than that contemplated in the IGRA. *Id.* Thus, relying on its determination that the State can seek an injunction in federal court pursuant to the Act, the court held that the statutes were in conflict, and that the Restoration Act ultimately governed the dispute. *Id.* at 1335.

Albeit in an attempt to answer a different question, the Fifth Circuit has explicitly held that the Restoration Act provides federal courts with power to issue an injunction sought by the State of Texas. The Magistrate does not cite this case in the R&R and provides no analysis as to why it does not constitute binding precedent. The Court finds it difficult to reconcile the R&R with the *Ysleta* decision.

Moreover, even disregarding that Fifth Circuit opinion, the Court disagrees that the text of the Restoration Act so clearly dictates the Magistrate's recommended result. The text of the statute itself is, at a minimum, ambiguous regarding whether federal courts have power to enjoin violations of the Act. While the Court agrees that the language in § 107(c) could be reasonably interpreted in the manner the Magistrate suggests, the Court disagrees that this is the only reasonable interpretation. For instance, taken literally, § 107(c)'s

command that "nothing in this section shall be construed as precluding the State of Texas" from seeking an injunction could mean Congress meant to foreclose *any* possible construction of the statute that precludes the State from bringing an injunction. That is, the Act expressly makes it impossible to give the statute any other meaning except one that results in the State's ability to bring suit. Failing to heed this portion of the statute, the Magistrate construes the text as solely providing jurisdiction over criminal actions (which can only be brought by a federal prosecutor), and not jurisdiction over civil injunction actions brought by the State of Texas. This reading precludes the State from bringing an action for injunctive relief, which directly contravenes the statute. Thus, an appeal strictly to the text leads to the conclusion that multiple plausible interpretations exist, if not indicating the opposite conclusion as that recommended in the R&R.

"When a statute is subject to differing interpretations, the court must 'examine its legislative history, predecessor statutes, pertinent court decisions, and post-enactment administrative interpretations.'" *Salazar v. Maimon*, 750 F.3d 514, 519 (5th Cir. 2014) (quoting *Rogers v. San Antonio*, 392 F.3d 758, 761 (5th Cir. 2004)). The Magistrate declined to utilize any of these other tools for divining legislative intent

because he concluded that the Act unambiguously failed to provide a specific grant of power to issue an injunction. R&R 7. However, as demonstrated above, the language in the Act is susceptible to multiple plausible interpretations. Thus, the Court concludes that an appeal to these other indicators of legislative intent is appropriate here.[7]

In looking to both case law interpreting the Restoration Act and its legislative history, it is difficult to deny that the statute was intended to provide an affirmative grant of authority to courts to issue injunctions if sought by the State of Texas. First, in addition to the Fifth Circuit's 1994 *Ysleta* decision, numerous other judges have read the statute to provide courts with the ability to issue an injunction. *See Texas v. Ysleta Del Sur Pueblo*, 431 F. App'x 326, 328 (5th Cir. 2011) ("The Restoration Act permits Texas to seek an injunction in federal court if the Tribe should engage in gaming activities prohibited by Texas law"; "In 1999, the Attorney General of Texas, using the avenue of relief permitted to the State under the Restoration Act, filed a civil

---

[7] The Court notes that the Fifth Circuit itself appealed to legislative history extensively in attempting to discern the meaning of the Restoration Act. *See Ysleta del Sur Pueblo v. State of Tex.*, 36 F.3d 1325 (5th Cir. 1994). Specifically, in determining that § 107(c) expressly authorizes courts to grant injunctive relief to the State of Texas, the court cited a Senate Select Committee on Indian Affairs Report that clarifies the meaning of that provision. *Id.* at 1334.

suit in the district court to enjoin the activities of the Casino[.]"); *State of Texas v. Ysleta del Sur Pueblo*, No. EP-99-CV-320-KC, 2016 WL 3039991, at *1 (W.D. Tex. May 27, 2016) ("[T]he Restoration Act provides a mechanism for addressing violations of its provisions. That mechanism requires Texas to bring suit in this Court to challenge alleged violations of the Act, and allows this Court to enter an injunction, if warranted."); *Alabama-Coushatta Tribes of Texas v. Texas*, 208 F. Supp. 2d 670, 680 (E.D. Tex. 2002) (concluding that "[t]he injunction sought by the State of Texas is authorized by both state and federal statutes" after analyzing the relevant provision of the Restoration Act); Judge Eisele Order 694, ("[T]he plain wording of sections 107(a) and (c) evince Congress's clear intent to limit the Tribe's sovereign immunity by allowing the State of Texas to enjoin reservation gambling using state anti-gaming laws."); *Texas v. Ysleta del Sur Pueblo*, 79 F. Supp. 2d 708, 710 (W.D. Tex. 1999) ("[T]he Restoration Act allows the State of Texas to bring suit in federal court to enjoin any such violations."), *aff'd sub nom. State v. Ysleta del Sur*, 237 F.3d 631 (5th Cir. 2000).

Further, the legislative history of the Restoration Act strongly suggests that Congress intended to provide federal courts with

authority to issue an injunction sought by the State of Texas. The present codified version of the Restoration Act originated in the House of Representatives in 1987. S. Rep. No. 100–90, at 7–8 (1987). After the House approved the bill, it proceeded to the Senate, where it was referred to the Senate Select Committee on Indian Affairs. *Id.* at 8. The Senate Committee unanimously recommended that the bill be voted upon favorably, as long as the House agreed to some of the Senate's amendments to the House version. *Id.* Those amendments, which were ultimately included in the final version of the bill, included a "[n]ew subsection[ ] 107(c)." *Id.* at 9. In the "Explanation of Amendments" section, Senator Daniel Inouye, on behalf of the Senate Committee, stated that this revision "make[s] it clear that the State of Texas may seek injunctive relief in federal courts to enforce the gaming ban." *Id.* at 9. Further, in its "Section-By-Section Analysis," the Senate Committee reiterated that § 107(c) "provides that the Federal courts shall have exclusive jurisdiction over violations of the federal ban on gaming established by this section and further *authorizes* the State of Texas to seek injunctive relief in Federal court to enforce the federal ban on gaming." *Id.* at 11 (emphasis added). The amendments suggested in the Senate Report were ultimately codified in the

Restoration Act. These statements in the Senate Report strongly suggest Congress's intent to confer jurisdiction over civil enforcement actions brought by the State of Texas. Neither Defendants nor the R&R suggest any countervailing legislative history that calls this intent into question.

In sum, even assuming that the rule that courts should not enjoin criminal activity applies, the R&R still incorrectly suggests that the specific grant of authority exception is not satisfied here. The Court concludes, consistent with the pertinent case law and legislative history of § 107(c), that the Restoration Act does provide federal courts with such authority.

  *iii. Federal Question Jurisdiction Exists over this Dispute*

The R&R, in its final section, raises doubts about federal jurisdiction over this dispute. R&R 8–9. The R&R suggests that because the Restoration Act only affirmatively provides criminal jurisdiction over Pueblo gaming, the United States Attorney is the only party that can bring suit, and he or she may only institute criminal proceedings. *Id.*

However, as explained previously, Congress intended to confer jurisdiction over suits by the State of Texas seeking injunctive relief.

Thus, the Magistrate began with the flawed premise that the Restoration Act confers solely criminal jurisdiction and that the State is not authorized to bring this lawsuit. Moreover, regardless of whether the State of Texas is a proper party to bring this suit, the Magistrate does not explain why the Court would lack subject-matter jurisdiction over a dispute arising under federal law. No provision in the Restoration Act prohibits the Court from entertaining an action arising under the Act as a federal question pursuant to 28 U.S.C. § 1331.

The Magistrate appears to suggest that because the State does not retain a right to pursue a cause of action under the Restoration Act, the Court lacks jurisdiction over this dispute. However, this reasoning conflates the Court's ability to grant relief to Plaintiff with the Court's jurisdiction to hear the case. As many courts have counseled, federal courts retain jurisdiction over cases arising under federal law regardless of whether the court ultimately determines that a plaintiff has a right of action under the pertinent federal statute. *See Hondo Nat. Bank v. Gill Sav. Ass'n*, 696 F.2d 1095, 1102 n.2 (5th Cir. 1983) ("As we otherwise make plain, the denial of injunctive relief was proper, not for lack of jurisdiction, but because [the plaintiff] has no private right of action."); *Parra v. Pacificare of Ariz.*, Inc., 715 F.3d 1146, 1151–

52 (9th Cir. 2013) (citing *Burks v. Lasker*, 441 U.S. 471, 476 n.5 (1979) ("The question whether a cause of action exists is not a question of jurisdiction.")) ("Subject matter jurisdiction exists to determine whether a federal statute provides a private right of action."). Thus, even if the Court held that the State of Texas has no right of action under the Restoration Act, the Court would still retain jurisdiction over the dispute.[8]

In sum, the Court rejects the Magistrate's rationale for denying Plaintiff's Application for Preliminary Injunction. However, after analyzing the four preliminary injunction factors, the Court agrees that Plaintiff's Application should be denied for the reasons that follow.

## III. APPLICATION FOR PRELIMINARY INJUNCTION

### A. Legal Standard

A preliminary injunction is an "extraordinary and drastic remedy." *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985) (quoting *Canal Authority v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974)). In order to prevail on a motion for a preliminary injunction, it is the movant's burden to clearly establish:

---

[8] This holding is limited to the specific jurisdictional issue raised in the R&R. The Court does not pass upon Defendants' numerous arguments regarding sovereign immunity or other jurisdictional questions that they have made or will make in this litigation.

"(1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) [that] his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) [that] granting the preliminary injunction will not disserve the public interest." *Google, Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016). "This is a 'difficult' and 'stringent' standard for the movant to meet." *Humana Ins. Co. v. Tenet Health Sys.*, No. 3:16-CV-2919-B, 2016 WL 6893629, at *11 (N.D. Tex. Nov. 21, 2016) (citing *Whitaker v. Livingston*, 732 F.3d 465, 469 (5th Cir. 2013) and *Janvey v. Alguire*, 647 F.3d 585, 591, 595 (5th Cir. 2011)). The decision regarding whether a plaintiff has carried its burden "is left to the sound discretion of the district court." *Kohr v. City of Houston*, No. 4:17-CV-1473, 2017 WL 6619336, at *2 (S.D. Tex. Dec. 28, 2017).

Here, Plaintiff seeks a mandatory preliminary injunction. A mandatory preliminary injunction, as opposed to a prohibitory injunction, seeks to alter the status quo prior to litigation rather than maintain it. That is, it mandates that defendants take some action inconsistent with the status quo rather than prohibiting them from altering the status quo. While the mandatory/prohibitory distinction is

not crucial to the inquiry, the Fifth Circuit has repeatedly held that mandatory injunctions warrant an even higher standard than prohibitory injunctions. *See Justin Indus., Inc. v. Choctaw Sec.*, L.P., 920 F.2d 262, 268 (5th Cir. 1990) ("[B]ecause [the plaintiff] is seeking a mandatory injunction, it bears the burden of showing a clear entitlement to the relief under the facts and the law."); *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) ("Mandatory preliminary relief, which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party."); *Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971) (quoting *Miami Beach Fed. Sav. & Loan Ass'n v. Callander*, 256 F.2d 410, 415 (5th Cir. 1958)) ("[W]hen a plaintiff applies for a mandatory preliminary injunction, such relief 'should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party.'").

## B. Analysis

For the reasons described below, Plaintiff has not clearly established its right to the "extraordinary and drastic remedy" of a mandatory preliminary injunction in this case.

### i. Substantial Likelihood of Success on the Merits

The Restoration Act prohibits all gaming activities that are unlawful pursuant to Texas law. However, the Act has been construed as allowing gaming activities that are legal under Texas law, such as certain forms of bingo. *See* Judge Eisele Order 690, 707. Thus, the question in this case is whether the specific Pueblo gaming activity at issue constitutes legal gaming or illegal gaming pursuant to Texas law. To award a preliminary injunction, Plaintiff must make a clear showing that it is substantially likely that Defendants are violating Texas law.

Here, Plaintiff's key piece of evidence is an inspection video depicting Plaintiff's counsel and its expert, Commander Guajardo, walking through the Speaking Rock Entertainment Center. *See* Appl. Ex. 1. The video shows rows of allegedly illegal machines in a casino-style atmosphere. *Id.* It further depicts Commander Guajardo playing the games offered on a random selection of these machines, showing how the gameplay appears to a user. Based on his experience depicted in the video, Commander Guajardo (along with another law enforcement officer with relevant experience who viewed the video subsequently) testified that the devices depicted in the video violated the Texas Penal Code. *See* Nov. 13, 2017, Hr'g Tr. (ECF No. 50) 86:7–19

(testimony of Commander Guajardo that he believed the machines in Speaking Rock were "gambling devices" in violation of the Texas Penal Code); 190:24–191:9 (testimony of Lieutenant Ferguson that he believed the machines violated the Texas Penal Code). The current Director of the Charitable Bingo Operations Division with the Texas Lottery Commission, Alfonso Royal, corroborated this conclusion. *Id.* at 152:10–153:11 (testimony of Mr. Royal that he believed the machines were inconsistent with state bingo laws and that they would not be approved by the Texas Lottery Commission).

For multiple reasons, this evidence fails to establish a clear, substantial likelihood that the machines violate Texas law. First, Plaintiff fails in its Application to demonstrate to the Court exactly which laws are being violated, and how exactly the machines violate these laws. The Application contains only six sentences dedicated to explaining how the machines are illegal. However, as Defendants stress, the determination of what activities are prohibited by the State is incredibly nuanced. Instead of delving into this nuance, Plaintiff rests solely on the argument that the machines violate Texas Penal Code § 47.01(7) (defining illegal "lotteries") because they allow users to pay "cash consideration to play a game of chance for the opportunity to

win cash prizes." Appl. 6. An illegal lottery, Plaintiff claims, is any game that includes the elements of chance, prize, and consideration. Mot. 6. This argument ignores the fact that every game of bingo—which is admittedly a lawful, regulated activity in Texas—also satisfies the definition of an illegal lottery and is thus theoretically a violation of the Penal Code. *See State v. Amvets Post No. 80*, 541 S.W.2d 481, 483 (Tex. Civ. App.—Dallas 1976, no writ) ("[W]e issue our temporary injunction restraining [the defendant] and its officers and members from setting up, operating or promoting for gain bingo games or any other lottery scheme whereby one or more prizes are distributed by chance among persons paying for the privilege of participating[.]"). Indeed, after *State v. Amvets* squarely held that bingo constitutes an illegal lottery, the Texas legislature amended the state Constitution to exclude bingo from the definition of gambling, and passed the Bingo Enabling Act to define the parameters of legal bingo in the State. *See* Tex. Atty. Gen. Op. at *2, GA-0541 (2007), 2007 WL 1189841 (discussing the history of the bingo amendment to the Texas Constitution and the subsequent Bingo Enabling Act). Accordingly, Plaintiff's argument that Defendants are violating the Texas Penal

Code does not advance the Court's understanding as to how the particular form of bingo at issue violates Texas law.

In its Reply Supporting Application, Plaintiff attempts to grapple with this issue, but once again fails to cite any pertinent laws that help the Court reach the clear conclusion that the machines in Speaking Rock are illegal. To support its argument, Plaintiff relies on (1) its own expert's opinion that the machines violate the law, (2) an advisory opinion issued by its own office that suggested that certain types of electronic bingo are unconstitutional, and (3) Judge Eisele's 2001 Order allegedly requiring Defendants to obtain a license from the Texas Lottery Commission to engage in bingo.

However, none of these sources rely on positive provisions of Texas law that assist the Court in determining whether the present bingo operation is illegal. While the Court is mindful of Commander Guajardo's expert opinion regarding the legality of the machines at issue, Commander Guajardo offers no explanation for his legal conclusion besides that the machines offer games including the elements of chance, prize, and consideration. Appl. Ex. 2 at 1.17–18. As discussed previously, this is insufficient justification for an injunction here. Further, the cited advisory opinion concerns "the

constitutionality of proposed legislation that would legalize the use of 'electronic pull-tab bingo'[9] by nonprofit organizations." Tex. Atty. Gen. Op. at *1, 2007 WL 1189841. Clearly, the opinion does not constitute state law, and does not directly answer the highly technical question of whether the machines at issue violate Texas law.[10]

Plaintiff also cites Judge Eisele's 2002 "Order Modifying Injunction" for the proposition that Defendants are violating state law because they do not have a permit from the Texas Lottery Commission

---

[9] The Court is unclear as to what exactly constitutes "pull tab" bingo, or "electronic pull-tab bingo." The advisory opinion defines electronic pull-tab tickets as "an electronic ticket used in electronic pull-tab bingo that is issued from a finite deal of tickets in which some of the tickets have been designated in advance as winning tickets." Tex. Atty. Gen. Op. at *3, 2007 WL 1189841. Plaintiff has not explained how this opinion regarding electronic pull-tab bingo relates to the present dispute.

[10] While attorney general advisory opinions can be persuasive based on their reasoning, "courts are not bound by attorney general opinions." *Cadena Comercial USA Corp. v. Texas Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 333 (Tex. 2017). Here, the cited advisory opinion relies on various sources in reaching its conclusion about the prohibition on video bingo machines. Tex. Atty. Gen. Op. at *4, 2007 WL 1189841. However, none of the pertinent sources appear to be valid statutes included in any code provision on which Plaintiff bases its claims, including the Texas Penal Code or the Bingo Enabling Act. Plaintiff's brief reference to this advisory opinion fails to explain the current validity of the laws relied on in the opinion, and how the conclusions in the opinion regarding the constitutionality of proposed bingo legislation are applicable in this context.

to operate charitable bingo activities. *See Texas v. del Sur Pueblo*, 220 F. Supp. 2d 668, 707 (W.D. Tex. 2001), *modified* (May 17, 2002). However, in that case Judge Eisele simply declined to issue a "declaration that various proposed activities [including bingo] do not violate this Court's injunction." Judge Eisele Order 702. In seeking a modification to the 2001 injunction, the Tribe submitted a proposal to Judge Eisele, which included an entirely separate regulatory system for tribal bingo. *Id.* at 707. While admitting it was a "close question," Judge Eisele held that "the Tribe should be required to procure a license from the Commission" before the court would "consider modifying the injunction to permit charitable bingo activities by the Tribe" consistent with the Tribe's proposal. *Id.* This holding is not applicable in this context, where Plaintiff seeks a new preliminary injunction unrelated to the previous injunction. The Court is not being asked to modify the 2001 injunction, but rather whether Plaintiff has shown Defendants' conduct is unlawful pursuant to Texas law. Further, Judge Eisele never held that the exact conduct at issue was a violation of the 2001 injunction—he merely declined to preemptively permit certain bingo-related activities. Accordingly, while the Court reserves judgment on

the legality of Defendants' conduct, Plaintiff's reliance on this holding does not show a clear likelihood of success on the merits.

Additionally, Plaintiff was unable to show at the evidentiary hearing how the machines at issue violate Texas law. While Plaintiff presented copious evidence that the machines emulate Las-Vegas-style slot machines, it cited no laws prohibiting bingo card-minders[11] from mimicking slot machines or the environment in which they are normally found.[12] *See* Nov. 13, 2017, Hr'g Tr. (ECF No. 50) 108:25–

---

[11] Defendant's expert defined a bingo card-minder as an "electromechanical device that enables players to play numerous cards of bingo as it's being played." Nov. 13, 2017, Hr'g Tr. 249:24–250:2.

[12] The only apparent nonconformity with Texas law that the Court is able to discern is that the machines accept cash and act "as a dispenser for the payment of a bingo prize" in violation of Texas Occupations Code § 2001.409. Defendants' expert admitted that this was the sole reason, in his opinion, that the machines did not perfectly align with state law. Nov. 14, 2017, Hr'g Tr. (ECF No. 51) 20:7–11. Defendants have explained their position that this statute applies only to "persons" and not to the Tribe, which is not a "person" under federal law. *Id.* at 65:2–5. Plaintiff has not responded to this argument, and it is unclear whether the argument ultimately will bear fruit. Regardless, Plaintiff here seeks a wholesale prohibition on the devices at issue. While the potentially unlawful aspects of the machines may need to be altered or enjoined, these minor deviations do not indicate a substantial likelihood that Plaintiff will succeed in obtaining an injunction against any and all use of the devices. Further, Plaintiff did not affirmatively argue this point as a basis in its Application for Preliminary Injunction. As such, it is unclear to what extent it bases its request on these violations, and, if it does, Defendants were not afforded an opportunity to respond to

34

109:9 (Cross-examination of Commander Guajardo) ("Q. All right. Can we agree that Texas law does not . . . preclude a facility from having low light? A. True. Q. Or chimes, bells, and, whistles? A. True. Q. Or an absence of clocks? A. True. Q. Or Windows? A. True."). Further, Plaintiff has cited no law prohibiting the use of pre-drawn bingo games (i.e., reenactments of games that occurred previously rather than a live reading of bingo numbers), which Defendants claim form the basis of the games on their machines. In fact, Plaintiff's principal expert was not even familiar with this concept. *See id.* at 111:15–19.

In contrast, Defendants present their own expert, Philip Sanderson, who was formerly the Director of the Charitable Bingo Division of the Texas Lottery Commission from 2007–2012. *Id.* at 242:15–22. Defense counsel asked Sanderson meticulous questions about the details of Texas bingo law in an attempt to show that Defendants' activity is technically not prohibited because it falls under the charitable bingo exception to gambling under Texas law. *See generally id.* at 250:24–273:19. This testimony describes how bingo card-minders can be stationary rather than hand-held, are permitted to

---

this argument. Thus, the Court will decline to issue a preliminary injunction on this basis and defer judgment until both parties have an opportunity to argue this point fully.

play up to sixty-six bingo cards at once, do not have to be a certain size, are not prohibited from making noise, may include non-bingo entertainment on the card-minder screen, do not have to show the actual bingo card on the screen, may be used in conjunction with pre-drawn bingo games, do not have to be used in a social environment, may contain buttons, and may contain visual "game reels" on the screen. *Id.* Further, Sanderson posits that that the casino-like atmosphere and availability of alcohol in bingo halls, which Plaintiff appears to object to at Speaking Rock, is fully authorized pursuant to state law. *Id.* Finally, Sanderson discusses how Defendants could constitute a charitable organization under Texas law, which is a prerequisite to operating a bingo hall. *Id.* In sum, Defendants' expert presents a compelling case that Defendants have carefully developed these machines to comply with state bingo laws. Thus, Sanderson's testimony supports the Court's conclusion that the legality of the machines in question will require a difficult, fact-intensive inquiry and assessment not easily resolved at this juncture. Hence, the Court finds that Plaintiff has not carried its burden of making a clear preliminary showing that the machines are unlawful.

Ultimately, the Court is tasked with enforcing the Restoration Act, which provides "[a]ll gaming activities which are prohibited by the laws of the State of Texas are hereby prohibited on the reservation." Restoration Act §107(a). This is an unusual statute that prohibits Defendants—who represent a sovereign entity—from engaging in certain activity outlawed by the State, but permits them to conduct other gaming activity permitted by the State. Adding to the exceptional nature of this statute is its prohibition on the State's exercise of regulatory authority over Defendants, which would normally help dictate what does and does not constitute unlawful gaming pursuant to state law. Defendants here exist in a twilight zone of state, federal, and sovereign authority where the outer legal limit of their conduct is difficult to assess with precision. The Court views the extensive litigation over gaming at Speaking Rock as a sort of trial-and-error process to test the limits of Texas law, with federal courts serving as an arbiter of those limits. In this case, contrary to the "brazen" lawlessness that Plaintiff alleges, Defendants argue (and it appears, at least preliminarily) that they have attempted to conform their conduct carefully to the exact specifications of Texas law. While the Court makes no judgment either way about whether these machines operate

consistently with the law, Plaintiff has fallen short of its burden to clearly show a substantial likelihood that they are inconsistent.

> ii. *Substantial Threat that Plaintiff will Suffer Irreparable Injury*

Plaintiff claims it will suffer irreparable injury because of the inability to enforce its own laws. Appl. 8. Plaintiff cites multiple cases for the proposition that the inability to enforce its own laws constitutes irreparable injury. *See, e.g., Maryland v. King*, 567 U.S. 1301 (2012) (granting a stay of a Maryland Court of Appeals decision that invalidated a state law where the law at issue protected Maryland's "law enforcement and public safety interests" and thus the inability to enforce it constituted irreparable harm); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406 (5th Cir. 2013) ("When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws.").

At this juncture, the Court is not convinced that the State will suffer irreparable injury. Unlike the DNA collection law at issue in *King*, the bingo laws at issue do not provide the State of Texas with "a valuable tool for investigating unsolved crimes[,] thereby helping to

remove violent offenders from the general population." *King*, 567 U.S. at *3. And, unlike in *Planned Parenthood*, the Court is not enjoining the State from enforcing its laws—the Court is declining to issue an injunction based on alleged violations of federal law.[13]

While the State certainly has a significant interest in enforcement of the Restoration Act, the inability to assert that interest during the pendency of litigation to determine whether a violation has occurred does not amount to irreparable injury. The purpose of the irreparable harm inquiry at the preliminary injunction stage is to "prevent the judicial process from being rendered futile by defendant's action or refusal to act." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974); *see also Meis v. Sanitas Serv. Corp.*, 511 F.2d 655,

---

[13] Plaintiff also made reference at the preliminary injunction hearing to *Idaho v. Coeur d'Alene Tribe*, which held that "the district court did not err in determining that the State would likely suffer irreparable harm to its economic and public policy interests if the Tribe were not enjoined from offering" gambling activities that violated the IGRA. 794 F.3d 1039, 1046 (9th Cir. 2015). While this case does indicate that it is within the district court's discretion to find irreparable harm in similar situations, it does not mandate that courts do so as a matter of law. Here, unlike in *Coeur d'Alene*, it is unclear that there is even a violation of the pertinent federal statute. Further, the alleged violations in this case involve an activity (bingo) that, while heavily regulated, is permitted by the State. Thus, offering bingo or bingo-style activities does not fully contravene Texas public policy. Contrastingly, in *Coeur d'Alene*, the violations involved Texas Hold 'Em poker, an activity that the state "explicitly prohibited" in all situations. *Id.* at 1045.

656 (5th Cir. 1975) ("[T]he purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits."). Nothing about Defendants' continued operation of the gaming devices in question would render futile a full judgment on the merits later in this case. The Court can make a decision later that would be just as effective as a decision now. Thus, the underlying purpose of issuing a preliminary injunction would not be fulfilled by granting one here.

### iii. Whether Threatened Injury to Plaintiff Outweighs Threatened Harm to Defendant

Plaintiff characterizes the threatened injury it faces as a violation of Texas public policy and the will of the citizens of Texas. Defendants, meanwhile, provide extensive arguments and evidence detailing the "immediate, immense and irreparable" impact of a preliminary injunction in this case. Resp. to Appl. 10. This impact includes the potential loss of up to 734 jobs, 335 of which belong to tribal members (representing twenty-eight percent of the tribe's membership over the age of eighteen). *Id.* at Ex. B (Declaration of Tribal Governor Carlos Hisa). Further, an injunction would have a "devastating" impact on Pueblo government services supported by income from Speaking Rock.

*Id.* Defendants provide uncontested evidence that income from Speaking Rock is the "largest source of funding" for services on the reservation including "Fire Safety and Operations, General and Housing Assistance to tribal elders, our tribal language restoration programs, scholarships for our children, our truancy prevention program, health care and veterans' services." *Id.*

Defendants offered multiple witnesses at the preliminary injunction hearing who are leaders of various tribal government divisions including the Director of Behavioral Health (who oversees mental health, alcohol/substance abuse, and child welfare programs), the Director of Economic Development (who oversees low-interest lending, financial literacy, tribal-owned business support, tax assistance, and job skills training programs), and an employee of the Tribal Empowerment Department (who described early childhood education programs, library services, higher education financial assistance, and tutoring programs that the Department operates). *See generally* Nov. 13, 2017, Hr'g Tr. (ECF No. 50) 197–235. Each of these Tribal officers testified that their departments would lose 30%, 60%, and 85% of their funding, respectively, if Speaking Rock were to close. *Id.* The Director of the Economic Development Department testified

41

that she would be forced to close her office completely without this funding. *Id.* The other department representatives testified that they would have to cut entire programs and conduct massive layoffs in the absence of Speaking Rock funds. *Id.* Plaintiff contested none of this evidence.

After balancing the equities, the Court concludes that Plaintiff has not demonstrated that the threat of noncompliance with its bingo laws and regulations outweighs the threatened harm to Defendants' community that an injunction might inflict, as well as the threat of interference with the Tribe's sovereign right to self-government. *See Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (factoring in "the prospect of significant interference with tribal self-government" to the balance of the equities); *Seneca-Cayuga Tribe of Oklahoma v. State of Okl. ex rel. Thompson*, 874 F.2d 709, 716 (10th Cir. 1989) (finding in a gaming case that the balance of equities tipped in favor of a tribe because the tribe stood to "lose income used to support social services for which federal funds have been reduced or are non-existent, and lose jobs employing Indians who face a [high] rate of unemployment[.]").

Arguably, Defendants may bear part of the responsibility for this threatened harm for having integrated an uncertain source of funding so deeply into their community fabric. However, this does not necessarily justify the potential harm to hundreds of tribal members who had no part in that decision. While the Court acknowledges and respects Plaintiff's right to effectuate the will of its citizenry through its laws, it is difficult to conclude that this abstract right outweighs the severe and tangible negative consequences of granting a preliminary injunction. Thus, the Court finds that Plaintiff has not met its burden of clearly demonstrating that its own harm outweighs the potential harm to Defendants.[14]

> iv. *Whether Granting the Preliminary Injunction will Disserve the Public Interest*

Finally, the Court concludes that granting a preliminary injunction would disserve the public interest. In addition to the previous discussion about the impact on the Tribe, Defendants provide letters from multiple State residents from the surrounding area that claim to support Speaking Rock's mission and continued existence. *See*

---

[14] The Court notes that regardless of the potential impact of enforcing the Restoration Act, the Court will ultimately base its decision on the legality of the bingo machines at issue here. The alleged beneficial impact of revenue from Speaking Rock does not entitle Defendants to engage in illegal activity to ensure the facility's viability.

Resp. to Appl. Ex. C. (attaching a letter from a local pastor claiming that Speaking Rock "has had a very positive impact on the community," a letter from an El Paso City Council member claiming "unanimous" support among council members for Speaking Rock and lauding its "great cooperation" with the police department, and a letter from a county judge characterizing Speaking Rock as a "valuable community asset"). Contrarily, Plaintiff has provided no specific evidence of the impact on the State of Texas of the continued operation of Defendants' allegedly unlawful machines.

Further, denying an injunction here "promotes the paramount federal policy that Indians develop independent sources of income and strong self-government," *Seneca-Cayuga*, 874 F.2d at 716, and respects "Congress' firm commitment to the encouragement of tribal self-sufficiency and economic development[,]" *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 344 (1983).

In this case, the Court holds that the State of Texas has not carried its heavy burden of showing a clear entitlement to the drastic remedy of a mandatory preliminary injunction. Thus, the Court concludes that declining to grant an injunction until it has completed a full review on the merits is a more judicious course.

## IV.  CONCLUSION

The Court concludes that while it adopts the R&R's suggestion to deny Plaintiff's Application for Preliminary Injunction, it rejects the reasoning on which the R&R is based.  Unlike the Magistrate, the Court concludes that the State of Texas may pursue injunctive relief in federal court for violations of the Restoration Act.  However, the Court finds that the State of Texas has not carried its burden of showing an entitlement to preliminary injunctive relief in this particular case.

Accordingly, **IT IS ORDERED** that the Magistrate's Report and Recommendation (ECF No. 64) is **ACCEPTED** insofar as it recommends denying preliminary injunctive relief, but **REJECTED** in its proposed reasoning.

**IT IS FURTHER ORDERED** that Plaintiff State of Texas's "Application for Preliminary Injunction" (ECF No. 9) is **DENIED.**

SIGNED this *29* day of **March, 2018**.

PHILIP R. MARTINEZ
UNITED STATES DISTRICT JUDGE