IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | No: 03:17-CV-00179-PRM |
| v. | § | |
| | § | |
| YSLETA DEL SUR PUEBLO, | § | |
| THE TRIBAL COUNCIL, THE | § | |
| TRIBAL GOVERNOR CARLOS HISA | § | |
| or his SUCCESSOR, | § | |
| | § | |
| Defendants. | § | |
| | § | |
| _____ | § | |
| | § | |
| YSLETA DEL SUR PUEBLO, | § | |
| THE TRIBAL COUNCIL, THE | § | |
| TRIBAL GOVERNOR CARLOS HISA | § | |
| or his SUCCESSOR, | § | |
| | § | |
| Counter-Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| KEN PAXTON, in his OFFICIAL | § | |
| CAPACITY AS THE TEXAS | § | |
| ATTORNEY GENERAL, | § | |
| | § | |
| Counter-Defendant. | § | |
| | § | |

**RESPONSE IN OPPOSITION TO COUNTER-DEFENDANT KEN PAXTON'S MOTION
FOR SUMMARY JUDGMENT ON DEFENDANTS' COUNTERCLAIM**

**INTRODUCTION**

Counter-Defendant cannot dispute that the Texas Constitution allows five groups to conduct charitable bingo, but not Indian tribes. He admits that he has no power to pursue alleged violations of Texas bingo laws, except as to Indian Tribes. He admits that the Restoration Act prohibits imposition of state gaming regulations, but also admits that during his decades of suing Indian tribes, he repeatedly has ignored this federal limitation and instead has sought, and is seeking in this action, to impose state gaming regulations on these Indian defendants. Because Counter-Defendant has not identified any facts that would allow him to avoid the consequences of his ongoing effort to enforce this defective state scheme in violation of the Equal Protection Clause of the United States Constitution, his motion for summary judgment should be denied.

**SUMMARY JUDGMENT STANDARD**

As the movant, Counter-Defendant bears the burden of showing not only the absence of a genuine issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), but also demonstrating that there is an absence of evidence to support the Counter Claim. *Id.* at 325. A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for a summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55. When applying the facts to the law, the Court must apply the "Indian canon of

construction." *State of Texas v. Ysleta del Sur Pueblo, et al.,* No. EP-99-CV-320-KC, ECF 510 at 70.

## EQUAL PROTECTION STANDARD OF REVIEW

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Equal protection is "a pledge of the protection of equal laws." *Yick Wo v. Hopkins,* 118 U.S. 356, 369 (1886). Analysis of Equal Protection claims has identified three levels of scrutiny for courts to apply: "strict scrutiny," "intermediate" scrutiny, and "rational basis" review. *See Plyler v. Doe*, 457 U.S. 202, 215-219 (1982). Which of the three levels a court applies depends upon the nature of the state constitutional provision or statute in question.

If the state classification disadvantages a "suspect class" or impinges upon the exercise of a "fundamental right," courts apply strict scrutiny. *Id.* at 2015-219 and nn.14, 15. The state scheme falls unless the government shows that the "classification has been precisely tailored to serve a compelling governmental interest." *Id.* at 217.

If the "classification, while not facially invidious, nonetheless give[s] rise to recurring constitutional difficulties," *id.,* it will be tested under intermediate scrutiny. Such difficulties arise, for example, when a state scheme discriminates against a class which shares some of the characteristics of the suspect classes. *See id.* at 215-221; *Trimble v. Gordon,* 430 U.S. 762, 767, (1977). To withstand intermediate scrutiny, the statutory classification must serve important governmental objectives and must be substantially related to the achievement of those objectives." *Craig v. Boren,* 429 U.S. 190, 197 (1976); *see also Plyler* , 457 U.S. at 217-220, *Lalli v. Lalli,* 439 U.S. 259, 265 (1978).

If neither strict nor intermediate scrutiny is appropriate, then the state scheme is reviewed for rational basis. Under the rational basis test, the state scheme must bear some fair relationship to a legitimate public purpose. *Cleburne Living Ctr., Inc. v. City of Cleburne, Tex.*, 726 F.2d 191, 195–96 (5th Cir. 1984), *aff'd in part, vacated in part sub nom. City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432 (1985).

### A.      Strict Scrutiny is the Applicable Standard of Review Here.

Strict scrutiny is required for determination of this motion both because the bingo scheme's classifications improperly exclude Indian Tribes, and because the Texas scheme and its enforcement by the Counter-Defendant impinge on a fundamental right of the Counter-Plaintiffs. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995) ("we hold today that all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny. In other words, such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests"); *Gaalla v. Brown*, 460 F. App'x 469, 477-78 (5th Cir. 2012).

So, for example, in *Dep't of Texas, Veterans of Foreign Wars of U.S. v. Texas Lottery Comm'n*, 760 F.3d 427 (5th Cir. 2014) an en banc Court of Appeals held that "the political advocacy restrictions in the Bingo Act **do not withstand strict scrutiny**. Not only has the Commission failed to articulate a compelling interest justifying the challenged provisions, but even if we were to accept the interests raised by the Commission as compelling, the restrictions are not narrowly tailored." 760 F.3d at 441 (emphasis added). Applying strict scrutiny, the en banc court stated:

> *4. The provisions cannot withstand strict scrutiny.* The Commission fails to identify a compelling state interest. It raises three rationales in support of the challenged provisions: 1) regulating gambling, including reducing the size of the gambling industry in Texas; 2) combating fraud by ensuring that bingo proceeds are only

used in support of charities, not lobbyists; and 3) promoting charities—that is, ensuring charities do not forgo spending their bingo revenue on their charitable purpose by squandering those funds on political advocacy. Notably, as the Charities and the district court stated, the Commission never attempts to characterize these interests as compelling. Indeed, the Commission never purports to justify the challenged provisions under strict scrutiny review. Rather, the Commission merely contends that the rationales are substantial state interests.

*Id.* at 439. As addressed in detail below, the Texas scheme as written and enforced cannot withstand strict scrutiny. It discriminates against Native Americans, and denies these Counter-Plaintiffs' their fundamental right to engage in economic development and provide important governmental services to Pueblo members through the conduct of bingo.

The United States Supreme Court has recognized that the "unique legal status [of Native Americans] is of long standing, and its sources are diverse." *Morton v. Mancari*, 417 U.S. 535, 555 (1974) (internal citation omitted). The federal government may adopt laws that advance its trust responsibility to Indians, *Id.* at 554-555. ("On numerous occasions this Court specifically has upheld legislation that singles out Indians for particular and special treatment"), But even federal legislation involving Native Americans requires strict scrutiny. *Brackeen v. Zinke*, No. 4:17-CV-00868-O, 2018 WL 4927908, at *12 (N.D. Tex. Oct. 4, 2018) ("Because the [Indian Child Welfare Act] relies on racial classifications, it must survive strict scrutiny. . . . To survive strict scrutiny review, the classifications must be 'narrowly tailored to further a compelling governmental interest'" (citation omitted)).

Moreover, states can never target Native Americans based on their status as Native Americans, and their Native American heritage.[1] *E.g., Meyers By & Through Meyers v. Bd. of*

---

[1] *Rice v. Cayetano*, 528 U.S. 495, 496 (2000) ("In interpreting the Reconstruction Era civil rights laws this Court has observed that racial discrimination is that which singles out 'identifiable classes of persons ... solely because of their ancestry or ethnic characteristics'" (citation omitted).

*Educ. of San Juan Sch. Dist.*, 905 F. Supp. 1544, 1570, (D. Utah 1995). In *Meyers*, the defendants argued "that the court should not apply the strict scrutiny reserved for racial classifications to the plaintiffs' equal protection claim because Native Americans are a political group, not a race." In rejecting that argument, the court recognized:

> The District, of course, does not enjoy the same special relationship with and power to regulate Indian tribes that the federal government has. The District has not shown how its allegedly disparate treatment of the plaintiffs is "tied rationally to the fulfillment of Congress' unique obligation toward the Indians." The District does not have to withhold its services for the federal government to fulfill any obligation it may have to educate the plaintiffs. Absent such a showing, local school boards are simply not free to discriminate between Indians and non-Indians based solely on their status.

*Id.* at *1570-71*; *accord Tafoya v. City of Albuquerque*, 751 F. Supp. 1527, 1530 (D.N.M. 1990) ("As the Supreme Court so clearly stated in *Morton*, Congress' obligations to Indians are constitutionally based and unique. The City of Albuquerque does not have comparable power to treat members of federally recognized Indian tribes or pueblos or members of the Navajo Nation differently than other groups of Indians or non-Indians"). As noted by the United States Supreme Court in a similar context:

> Section 1 of the Fourteenth Amendment is an explicit *constraint* on state power, and the States must undertake any remedial efforts in accordance with that provision. To hold otherwise would be to cede control over the content of the Equal Protection Clause to the 50 state legislatures and their myriad political subdivisions. . . . [T]he Framers of the Fourteenth Amendment [] desired to place clear limits on the States' use of race as a criterion for legislative action, and to have the federal courts enforce those limitations.

*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 490-91 (1989) (emphasis in original). State constitutional and legislative schemes like the bingo scheme at issue here, and their enforcement by a state official, must be analyzed under strict scrutiny. *Massachusetts Bd. of Ret. v. Murgia,* 427 U.S. 307, 313 (1976) (strict scrutiny appropriate where a group has experienced a

"'history of purposeful unequal treatment' or been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities").[2]

### B. If the Court Declines to Apply Strict Scrutiny, then Intermediate Scrutiny Should be Applied to Review of the Counterclaim.

When the person or entity that is the subject of different treatment under a state constitutional or statutory scheme is a member of a class that historically has been the object of discrimination, the Supreme Court has required that either strict or intermediate scrutiny be applied to analysis of the state scheme. Under intermediate scrutiny, the government must at least demonstrate that the classification is substantially related to an important governmental objective. *Able v. United States*, 155 F.3d 628, 631-32 (2d Cir. 1998); *see also United States v. Virginia,* 518 U.S. 515, 532-33 (1996) (under intermediate scrutiny, the government must articulate an "exceedingly persuasive" justification for using the otherwise discouraged

---

[2] The Court can take judicial notice of the historic treatment of Native Americans. *Smith v. Townsend*, 148 U.S. 490, 495 (1893) ("[I]t will be seen that the Indian Territory lies between the state of Texas on the south and the state of Kansas on the north, and **it is a matter of public history, of which we may take judicial notice**, that, as these two states began to be filled up with settlers, longing eyes were turned by many upon this body of land lying between them, occupied only by Indians, and, though the territory was reserved by statute for the occupation of the Indians, there was great difficulty in restraining settlers from entering and occupying it" (emphasis added). There can be no dispute that Native Americans in Texas and throughout the United States have experienced a "history of purposeful unequal treatment." *See, e.g.* Exhibit A, excerpt of *The Southwest Indian Report, A Report of the U.S. Commission on Civil Rights* (May 1973), available at https://babel.hathitrust.org/cgi/imgsrv/download/pdf?id=uiug. 30112014266248;orient=0;size=100;seq=16;attachment=0 (last visited Dec. 12, 2018); Exhibit B excerpt of Tighe, S., *Of Course We Are Crazy: Discrimination of Native Americans Through Criminal Justice*, Justice Policy Journal, Vol. 11, No. 1 (Spring) (2014), available at: http://www.cjcj.org/uploads/cjcj/documents/tighe_discrimination_final_formatted.pdf (last visited Dec. 5, 2018); Exhibit C, excerpt of Nelson, Talia, "Historical and Contemporary American Indian Injustices: The Ensuing Psychological Effects" (2011). Commonwealth Honors College Theses and Projects. Paper 6. https://scholarworks.umass.edu/chc_theses/6 (available at https://scholarworks.umass.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=1027&conte xt=chc_theses (last visited Dec. 5, 2018); Exhibit D,excerpt from Grua David W., "Citizen[s] With a Difference": The U.S. Commission on Civil Rights and Native Americans, 1961-1981 (Federal History 2011) (last visited Dec. 5, 2018).

classification).  Intermediate scrutiny is also applied to review a law that affects 'an important, though not constitutional, right.'" *Ramos v. Town of Vernon,* 353 F.3d 171, 175 (2003) (citing *United States v. Coleman,* 166 F.3d 428, 431 (2d Cir.1999).

### C.      At a Minimum, Counter-Defendant Must Show That the Bingo Scheme He Seeks to Enforce, and His Improper Effort to Impose State Regulatory Requirements, Survive Under Rational Basis Analysis.

Even under the "rational basis" review, courts "insist on knowing the relation between the classification adopted and the object to be attained."  *Romer v. Evans,* 517 U.S. 620, 632 (1996); *Heller v. Doe,* 509 U.S. 312, 321 (1999), (basis for a classification must "find some footing in the realities of the subject addressed by the legislation").  The court may look to evidence to determine whether the basis for the underlying debate is rational.  *Plyler v. Doe,* 457 U.S. 202, 228 (1982) (finding an asserted interest in preserving state resources by prohibiting undocumented children from attending public school to be irrational).  The search for a rational relationship "ensure[s] that classifications are not drawn for the purpose of disadvantaging the group burdened by the law."  *Romer,* 517 U.S. at 633.  The classification itself must be related to the purported interest.  *Plyler,* 457 U.S. at 220.  Unless state action that intentionally singles out an individual or entity for adverse treatment is supported by some rational justification, it violates the Fourteenth Amendment's command that no State shall "deny to any person within its jurisdiction the equal protection of the laws."  *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 610 (2008) (Stevens, J. with whom Souter, D. and Ginsburg, R. join, dissenting).

### ARGUMENT

### I.      The Pueblo Did Not Bring a Claim Under 42 U.S.C. § 1983.

Counter-Defendant's lead argument, to which it dedicates nearly twenty percent of its memorandum, is a claim that the Pueblo "is not a proper claimant under Section 1983."  ECF No. 147 at 6-9.  But the Counter Claim *does not include* a claim under 42 U.S.C. § 1983.

Counter-Defendant nevertheless attacks a non-existent § 1983 claim by arguing that violation of the Equal Protection Clause of the United States Constitution cannot be challenged in federal court unless Congress has provided a vehicle for doing so. Not only is that wrong as a matter of law, it is inapplicable to this Declaratory Judgment Act litigation.

This is not a "stand-alone" Equal Protection Act claim. Instead, Counter-Plaintiffs seek a declaratory judgment confirming Counter-Defendant's violation of all three Counter-Plaintiffs' constitutional right to Equal Protection of the Law. Yet even if this were a "stand alone" constitutional claim, it would be proper. As the United States Supreme Court has confirmed:

> The Constitution . . . does not "partake of the prolixity of a legal code." It speaks instead with a majestic simplicity. One of "its important objects," is the designation of rights. And in "its great outlines," the judiciary is clearly discernible as the primary means through which these rights may be enforced. . . . At least in the absence of "a textually demonstrable constitutional commitment of [an] issue to a coordinate political department," we presume that justiciable constitutional rights are to be enforced through the courts. And, unless such rights are to become merely precatory, the class of those litigants who allege that their own constitutional rights have been violated, and who at the same time have no effective means other than the judiciary to enforce these rights, must be able to invoke the existing jurisdiction of the courts for the protection of their justiciable constitutional rights.

*Davis v. Passman*, 442 U.S. 228, 241-43 (1979) (citations and footnote omitted). *See also Vill. of Willowbrook v. Olech*, 528 U.S. 562, 565 (2000) (standalone Equal Protection claim). In any event, this Court has confirmed that it has subject matter jurisdiction over the Counter Claim under the Declaratory Judgment Act. ECF No. 115. Counter-Defendant's second bite at the subject matter jurisdiction apple, under the guise of its §1983 argument, has no merit.

## II.     Counter-Plaintiffs Have a Fundamental Right To Offer the Gaming Activity of Bingo on The Pueblo's Reservation and Lands.

The Counter-Plaintiffs have a fundamental sovereign right to engage in gaming on the reservation and lands of the Ysleta del Sur Pueblo, both because Congress has preempted the field of Indian gaming through laws such as the Restoration Act, and because of the Ysleta del

Sur Pueblo's right to make its own laws and to be governed by them. *Cabazon Band of Mission Indians v. Riverside Cnty., State of Cal.*, 783 F.2d 900, 904 (9th Cir. 1986), *aff'd* 480 U.S. 202 (1987). Gaming offered by the Counter-Plaintiffs is not subject to oversight by the State of Texas unless provided otherwise by Congress. *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148 (1973) ("on reservations, state laws may be applied unless such application would interfere with reservation self-government or would impair a right granted or reserved by federal law").

The Counter-Plaintiffs' right to offer Bingo on the reservation and lands of the Pueblo has been limited by Congress, but only slightly, specifically allowing the Counter-Plaintiffs to conduct "*gaming activities*" that are not "*prohibited*" by "*the laws*" of the State of Texas. Pub. L. No. 100-89, Section 107.[3] Specifically, Section 107(a) of the Restoration Act as enacted by Congress and signed by President Reagan states:[4]

> (a) IN GENERAL. – All gaming activities which are prohibited by the laws of the State of Texas are hereby prohibited on the reservation and lands of the tribe.

But in Section 107(b) of the Restoration Act Congress did more – it prohibited the State of Texas from enforcing its gaming regulatory requirements on the Pueblo's reservation and lands:

> (b) NO STATE REGULATORY JURISDICTION. – Nothing in this section shall be construed as a grant of civil or criminal regulatory jurisdiction to the State of Texas.

In the face of this federal legislation, the Counter-Defendant's claim that he can impose state regulatory jurisdiction cannot survive strict scrutiny.

---

[3] The Restoration Act is no longer included in the United States Code. Citation throughout this Response is therefore to the Public Law, a copy of which is available at https://www.gpo.gov/fdsys/pkg/STATUTE-101/pdf/STATUTE-101-Pg666.pdf (last visited Dec. 4, 2018)

[4] Counter-Defendant attempts to persuade this Court that draft versions of the legislation introduced early on are somehow controlling on this Court. As noted in the argument at Subsection IV. A. of the Response, that is not true: the final legislation as passed by Congress and signed by President Ronald Reagan controls the issues in this action.

Indeed, the Counter-Defendant's arguments in his motion for summary judgment raise a question similar to that addressed in *Lawrence,* when the Court asked whether a majority of citizens could use the power of the state to enforce "profound and deep convictions accepted as ethical and moral principles" through the criminal code. *Lawrence*, 539 U.S. at 571. The question here is whether Texas voters can enforce those same principles through regulation of bingo operations on land held in trust by the federal government for the benefit of Native Americans. They cannot. *Palmore v. Sidoti,* 466 U.S. 429, 433 (1984) ("[T]he Constitution cannot control [private biases] but neither can it tolerate them."). The Texas state government must adhere to the Restoration Act, which is controlling federal law. The state government cannot "mandate [its] own moral code." *Lawrence,* 539 U.S. at 559 (citing *Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 850 (1992)). "[M]oral disapproval, without any other asserted state interest," has never been a rational basis for legislation. *Lawrence,* 539 U.S. at 582, 123 S.Ct. 2472 (O'Connor, J, concurring). Tradition alone cannot support a state legislative scheme in the face of a constitutional challenge. *See Williams v. Illinois,* 399 U.S. 234 at 239, 90 S.Ct. 2018; *Romer,* 517 U.S. at 635, 116 S.Ct. 1620; *Lawrence,* 539 U.S. at 579, 123 S.Ct. 2472.

**III.    Genuine Issue of Material Fact Preclude Summary Judgment on the Counter-Claims.**

    **A.    The Texas Bingo Classification System's Exclusion of Indian Tribes Violates Equal Protection Guarantees.**

        **1.    This Court Has Held that The Ysleta del Sur Pueblo Cannot Engage In Bingo Under the Texas Bingo Scheme.**

There is no legitimate reason for excluding Indian Tribes from the Texas constitutional and statutory classification of entities allowed to conduct the gaming activity of bingo. But that is just what this state scheme does. In interpreting the constitutionality of this state classification

scheme in the face of the federal Restoration Act, the Court must apply the "Indian canon of construction" as this Court itself has held:

> The ambiguity surrounding the "multifarious issues of what is and is not permitted by the 1991 amendment" to the Texas constitution is well-recognized. *See Verney*, 2006 WL 2082085, at *2; *see also G2, Inc.*, 485 F. Supp. 2d at 766. Thus, "in construing [these] admittedly ambiguous statute[s], [the Court] must be guided by that eminently sound and vital canon, that statutes passed for the benefit of dependent Indian tribes . . . are to be liberally construed, doubtful expressions being resolved in favor of the Indians." *Blatchford*, 501 U.S. at 795 (internal citations omitted).

*Ysleta del Sur Pueblo, et al.,* No. EP-99-CV-320-KC, ECF 510 at 70.

Any question as to whether the Texas constitutional and statutory classification of entities allowed to conduct the gaming activity of bingo excludes Indian tribes has been addressed by this Court, which has held that the bingo scheme specifically makes Indian Tribes ineligible to conduct bingo.[5]  The scheme therefore prohibits the Pueblo from conducting bingo as an Indian Tribe while allowing five other categories of entities to offer bingo.  Although the Counter-Defendant complains that all the Pueblo has to do is get a license to conduct bingo, he fails to note that licensing is a regulatory requirement, which is something the Texas scheme cannot impose under the Restoration Act.[6]  *Dep't of Texas, Veterans of Foreign Wars* , 760 F.3d at 437 ("we hold that the Bingo Act creates a regulatory regime that grants the Charities a benefit—in the form of a license—to conduct bingo game"); *accord In re F.C.C.*, 217 F.3d 125, 137 (2d Cir. 2000) ("*When the FCC decides which entities are entitled to spectrum licenses under rules and conditions it has promulgated, it therefore exercises the full extent of its regulatory capacity*" (emphasis in original, citation omitted)).

---

[5] *E.g.,* Order Regarding Interim Petition to Conduct Bingo, *Ysleta del Sur Pueblo*, No. EP-99-CV-320-KC, ECF No. 323 at 2-4.
[6] ECF 147 at 9-10.

Because this naked exclusion of Indian Tribes from the category of groups that can offer bingo is unconstitutional, "the continued implementation of such a scheme constitutes an ongoing violation of federal law." *Lynch v. Pub. Sch. Ret. Sys. of Mo., Bd. Of Trs.*, 27 F.3d 336, 339 (8th Cir. 1994) (reversing decision to dismiss plaintiff's equal protection claim because of sovereign immunity and holding that court "clearly has the authority to find the statutory scheme unconstitutional and to order an appropriate remedy.").

**B.      Counter-Defendant's Admitted Efforts to Enforce State Regulatory Authority Prohibited by Congress Violates Equal Protection Guarantees.**

The plenary power of Congress to deal with the unique issues concerning Indian nations is drawn both explicitly and implicitly from the United States Constitution. As set out in the Counter Claim (and denied by the Counter-Defendant in his answer[7]):

> 75. Article I, Section 8, Clause 3 states, in part: "The Congress shall have Power to…regulate Commerce...with the Indian Tribes…" This language in Article I, Section 8, Clause 3 is known as the Indian Commerce Clause.

ECF No. 121 at 11.  And as recognized in the Counter-Defendant's Motion for Summary Judgment, "it is settled that 'the unique legal status of Indian tribes under federal law' permits the Federal Government to enact legislation singling out tribal Indians."  ECF No. 147 at 9 note 2.  Congress did just that in the Restoration Act by prohibiting Texas from enforcing its gaming regulatory requirements on the Pueblo's reservation and lands:

> (b)  NO STATE REGULATORY JURISDICTION. – Nothing in this section shall be construed as a grant of civil or criminal regulatory jurisdiction to the State of Texas.

Yet as confirmed in his Answer to the First Amended Counterclaim, the Counter-Defendant here is violating this very provision of the Restoration Act.  Specifically, Counter-Defendant, "admit[s] that Counter-Defendants (*sic*) **seek[s] Counter-Plaintiffs' compliance with Texas**

---

[7] ECF No. 130 at 13 ¶ 75.

**regulations** that apply to entities engaged in bingo in the State." ECF No. 130 ¶ 157 (emphasis added). But it is only Texas law, not regulations, that limit the gaming activities in which these Counter-Plaintiffs may engage. And as to the restrictions of Texas law, this Court recently held:

> [T]hough the Court must interpret Texas law to determine the legality of the Tribe's gaming operations, Texas law is "operat[ing] as surrogate federal law on the Tribe's reservation." *Ysleta del Sur Pueblo v. Texas*, 36 F.3d 1325, 1334 (5th Cir. 1994). When interpreting federal laws enacted for the benefit of Native American tribes, ambiguities must "be liberally construed, doubtful expressions being resolved in favor of the [tribe]." *Blatchford v. Native Vill. of Noatak & Circle Vill.*, 501 U.S. 775, 795 (1991) (internal citations omitted); *see also Seminole Tribe of Fla. v. Butterworth*, 658 F.2d 310, 316 (5th Cir. 1981) (interpreting ambiguous Florida gambling statute in favor of Indian tribe).

*Ysleta del Sur Pueblo*, No. EP-99-CV-320-KC, ECF No. 510 at 69. Ignoring this holding by the Court, Counter-Defendant seeks to enforce regulations he knows do not apply. He also ignores this Court's instruction:

> Texas is advised to take account that this is not a Texas state court and **the Pueblo Defendants are not the usual Texas citizens**, rather they are a sovereign nation. There are complex issues of federal law overlapping the interpretation of these Texas state gaming statutes that Texas has failed to acknowledge.

*Ysleta del Sur Pueblo*, No. EP-99-CV-320-KC, ECF No. 510 at 69-70 (emphasis added).

Ignoring this admonishment, Counter-Defendant continues to argue that "the Restoration Act . . . provides that the Tribe is on an equal footing to engage in gaming **that any other citizen of Texas can do**" (ECF 147 at 9 n.2).

And there can be no question that what the Counter-Defendant seeks to enforce is indeed a regulatory scheme:

> The Charities point to several features of the [Texas] bingo program that **convincingly illustrate its primary function as a regulatory scheme**. For example, the Commission's Charitable Bingo Division . . . regulates all bingo-related activities, including the types of games played, game frequency and times, and bingo-employee qualifications. Tex. Occ.Code Ann. §§ 2001.055, 2001.419, 2001.313. The provision's placement in Texas's Occupations Code further supports its characterization as an occupational license. As one court aptly stated . . . "[The government] may not use its regulatory powers to influence or penalize

speech." Accordingly, **we hold that the Bingo Act creates a regulatory regime** that grants the Charities a benefit—in the form of a license—to conduct bingo games, rather than a government subsidy.

*Dep't of Texas, Veterans of Foreign Wars of U.S.*, 760 F.3d at 437 (emphasis added) (internal citations omitted).

The Counter-Defendant seeks to unlawfully expand the regulatory reach of the State of Texas - ignoring both Congress' prohibition on regulation and this Court's counsel to recognize the limits placed on the Counter-Defendant's actions under federal law. Counter-Defendant's continued effort to impose state regulations through the federal courts, an effort aimed at prohibiting these Counter-Plaintiffs from exercising a fundamental right guaranteed to them by Congress, violates the Equal Protection guaranties in the United States Constitution.[8] For this reason alone the motion for summary judgment must be denied.

### C. The Texas Enforcement Scheme That Prohibits Counter-Defendant From Enforcing State Gaming Laws Unless an Indian Tribe is Involved Violates Equal Protection Guarantees.

Counter-Defendant concedes that he, and only he, prosecutes Indian Tribes for alleged violations of Texas gaming laws – and he concedes that everyone else in the state is subject to the legal oversight of local district attorneys:

> [T]he reason is straightforward **and embedded in the structure of the Texas Constitution**. The duties of the Attorney General of Texas "are distinct and generally unrelated to the duties of county and district attorneys to represent the State in criminal prosecutions." *State ex rel. Hill v. Pirtle*, 887 S.W.2d 921, 930 (Tex. Crim. App. 1994) (en banc); *see* TEX. CONST. art. 5, § 21; TEX. CODE CRIM. PROC. ANN. arts. 2.01, 2.02.

---

[8] "[W]we are mindful of the settled principle of statutory construction that 'statutes passed for the benefit of dependent Indian tribes ... are to be liberally construed, doubtful expressions being resolved in favor of the Indians.'" *Peyote Way Church of God, Inc. v. Thornburgh*, 922 F.2d 1210, 1219 (5th Cir. 1991)

ECF 147 at 12 (emphasis added). But the Counter-Defendant does not claim, nor could he claim, that the El Paso County district attorney could not prosecute the Defendants for nuisance in exactly the same way as the Counter-Defendant has done in bringing this action. Instead, Counter-Defendant simply argues that "embedded in the structure of the Texas Constitution" is a limitation that only lets him litigate these issues against Indian Tribes. He argues that the "structure of the Texas Constitution" singles out Indian Tribes for his oversight on these issues.

This alleged "structure" violates the Equal Protection guarantees of the United States Constitution. The Counter-Defendant could avoid that result by stepping back and allowing the El Paso County district attorney, who is the "State of Texas" under Texas law, to bring this case. But the Counter-Defendant believes that local district attorneys will not do so for lack of political will. *See* Exhibit E, transcript of proceedings at pages 37-39.[9] Instead of leaving the prosecution of this matter to the local district attorney as it does for every other alleged violation of Texas gaming laws, the Counter-Defendant has taken it upon himself to pursue litigation against Indians.[10] That decision violates Equal Protection guarantees, and requires denial of the motion for summary judgment challenging the Counter Claim.

## IV. Factual Claims Argued by the Counter-Defendant are Inaccurate.

### A. The Pueblo Did Not Waive its Sovereign Right to Engage in Gaming.

Counter-Defendant's argument that a tribal resolution bars all gaming by the Counter-defendant (ECF No. 147 at 3) ignores the language passed by Congress in the Restoration Act, and is wrong on many levels. First, and contrary to the Memorandum in Support, the tribal

---

[9] Motion Hearing on Opposed Motion for Preliminary Injunction, Nov. 14, 2017, Vol. 2 of 2.
[10] Counter-Defendant admits that the suits he has brought in his capacity as Attorney General to enforce the Texas scheme have all been against Indian Tribes. Exhibit F [Answer and Supplemental Answer to Interrogatories 23 and 24].

resolution cited and quoted by the Counter-Defendant does not "appear[] in the text of the Restoration Act" as a simple reading of the Restoration Act confirms. *See* ECF No. 56, Pueblo Defendants' Memorandum of Law: The Ysleta del Sur Pueblo Never Waived Its Right to Engage in Gaming (for the sake of brevity, ECF No. 56 is incorporated by reference).

And more to the point, the red herring resolution to which Counter-Defendant tethers its argument was adopted by the Pueblo in response to the objections voiced by Comptroller Bullock in connection with **H.R. 1344** – a bill that never passed Congress. *See* Ysleta del Sur Pueblo Council Resolution No. TC-02-86 (Exhibit L, ECF No. 56-12). The Resolution was specific to H.R. 1344, referencing that proposed legislation by title, and set forth the exact language to be inserted in the legislation. *Id.* Although H.R. 1344 was amended to include that language, **H.R. 1344 died in the 99th Congress and never became law**. *See* THOMAS (Library of Congress) Report on all Congressional Action on H.R. 1344. (Exhibit C, ECF No. 56-3).

The legislative vehicle that became the Restoration Act was H.R. 318, which did not contain an absolute bar to gaming. *See* Pub. L. No. 100-89 Sections 107(a), (b) and (c). To the contrary, as passed it specifically allows all gaming activities that are not prohibited by the laws of the state of Texas. Although it references (but does not quote from) the Pueblo's earlier resolution, Congress *did not* incorporate the language from the Pueblo's resolution.

Moreover, the inclusion of the reference to the Pueblo's resolution regarding amendments *to H.R. 1344* was a scrivener's error. On June 18, 2002, the United States Senate, Committee on Indian Affairs heard testimony regarding the implementation of the Restoration Act. *See* Report of the Senate Indian Affairs Committee, Report No. 107-51 (2002) (Exhibit M, ECF No. 56-13). One of the witnesses was Alex Skibine, the Deputy Counsel for Indian Affairs for the House Interior Committee that oversaw the passage of the Restoration Act in the House of

Representatives. *Id.* at 10. According to Mr. Skibine, when the Senate Indian Affairs Committee amended the House version of H.R. 318 to remove the outright prohibition on gaming found in H.R. 1344 and referenced in the Pueblo's resolutions, Senate staff simply forgot to take out the reference to the resolutions. *Id.* at 30.

Mr. Skibine testified that a similar mistake occurred during the passage of the Indian Gaming Regulatory Act ("IGRA"), when the Senate removed language that would have provided a tax exemption for Indian tribes, but left in a parenthetical reference to Chapter 35 of the Internal Revenue Code chapter that authorizes such tax exemptions. *Id.* at 12. As Mr. Skibine correctly noted in his testimony, the United States Supreme Court was asked to reconcile this conflict in IGRA in *Chickasaw Nation v. United States,* and the Court concluded that the reference to Chapter 35 was a scrivener's error and could not be read to overcome the express intent of Congress not to provide the tribes with a tax exemption. *Id.* at 12; *see also Chickasaw Nation v. United States,* 534 U.S. 84, 90-95 (2001). Mr. Skibine concluded that the Court's analysis in *Chickasaw Nation v. United States* should be applied to the reference to the Pueblo's resolution in the Restoration Act, and that under the *Chickasaw* analysis the drafting error that allowed the reference to remain in the Restoration Act cannot overcome the express intent of Congress to permit the Pueblo to offer gaming. ECF No. 56-13 at 12.

**B.     The Pueblo Continually Has Worked to Comply With the Restoration Act's Requirements.**

As the Counter-Defendant must concede (ECF No. 147 at 4), in fifteen years of litigation between these parties, the Pueblo's operations have only twice been held to be contrary to the Restoration Act and Court order: Once for offering gift cards that the Court held were "cash equivalents" because, the court held, products could be purchased using the cards and then returned for a cash refund. *Ysleta del Sur Pueblo, et al.,* No. EP-99-CV-320-KC, ECF 281 at 5

17

("An electronic or mechanical device like an eight-liner is not prohibited under Texas law if it meets certain strict criteria. . . . In the instant case, the Visa debit cards issued by the Tribe's Casino are not "noncash merchandise."). And a second time because the Court held that donations did not qualify as a "product" for which sweepstakes entries could be provided. *Ysleta del Sur Pueblo, et al.,* No. EP-99-CV-320-KC, ECF 510 at 53. Contrary to the Counter-Defendant's allegations, the history between these parties confirms that the Counter-Plaintiffs' consistently have worked to comply with the orders of this Court and the requirements of the Restoration Act. *See* ECF 77 at 36 ("In sum, Defendants' expert presents a compelling case that Defendants have carefully developed these machines to comply with state bingo laws.")

### C. "Similarly Situated" Entities Are Not Prosecuted by the Counter-Defendant.

The Counter Claim identifies specific bingo operations being conducted throughout the State of Texas with no action being taken against them by the Counter-Defendant. Counter Claim, ECF No. 121 at ¶¶ 117-138. In his answer, the Counter-Defendant merely claims that he lacks knowledge regarding these other operations. ECF No. 130 at ¶¶117-138. And in his motion for summary judgment, Counter-Defendant simply claims that HE cannot do anything about those other operations. But the challenge in the Counter Claim is to the state scheme "embedded in the structure of the Texas Constitution" that allows organizations to flaunt Texas law without prosecution while simultaneously allowing Counter-Defendant to sue Indian Tribes seeking to enforce regulatory requirements that Congress itself has confirmed do not apply.

### D. To the Extent the Texas Scheme Denies the Counter-Plaintiffs a Fundamental Right, There is no Need for the Court to Conduct a "Similarly Situated" Comparison.

Counter-Plaintiffs have a sovereign right to engage in gaming. Congress has limited that right, but never extinguished it. And Congress confirmed that its limitation on that right did not

include a grant of regulatory authority to Texas. Yet the Counter-Defendant admits he is seeking through litigation what Congress says he can't: impose state regulatory requirements. Ignoring federal statutory limitations prohibiting regulation denies these Counter-Plaintiffs a fundamental federal right to engage in gaming, and can only be described as animus toward these Counter-Plaintiffs. Where, as here, "animus is readily obvious, it seems redundant to require that the plaintiff show disparate treatment in a near exact, one-to-one comparison to another individual." *Swanson v. City of Chetek*, 719 F.3d 780, 784-85 (7th Cir. 2013).

### E. The Size of Operations Does Not Alter Their Character.

The Plaintiff in this action, represented by the Counter-Defendant, offers not a single piece of evidence to contradict the averments in the Counter Claim setting forth in detail the operation of bingo halls throughout Texas that go unchallenged by the Counter-Defendant. Indeed, the Counter-defendant, on behalf of the Plaintiff, repeatedly has responded both to the Counter Claim and to discovery by simply saying it does not know what is going on as to bingo in Texas. *See* Answer to Amended Counter Claim at Paragraphs 96-103, 117-138. *See also* Exhibits G, H, and I. [Responses to Discovery provided by Counter-Defendant on behalf of Plaintiff State of Texas]. Yet Counter-Defendant's claimed "lack of knowledge" ignores its own expert's report confirming many of the specific facts averred in the Counter-Claim. *A Message From Alfonso D. Royal, III Charitable Bingo Operations Director - August 2017*: Calendar Year 2016 Charitable Bingo Financial Highlights, www.txbingo.org/export/sites/bingo/Documents/ Bingo_Directors_Message_08_2017.pdf (last visited December5, 2018).[11]

---

[11] ECF No. 121 at ¶¶ 96-102; *see also* Counter-Defendant's Answer to those paragraphs in ECF No. 130. Defendant's own expert confirms that the Texas bingo industry is responsible for providing tens of millions of dollars to charities, cities and counties in the State of Texas, and tens of millions of dollars to the State of Texas's General Revenue Fund; in 2016, the total gross receipts from bingo in the State of Texas exceeded $761 million; in 2016, $19.1 million in gross

Instead of addressing facts, Counter-Defendant simply argues that the scope of bingo operations changes their character:

> First, there is no competent summary judgment evidence that other individuals or entities in the State of Texas are engaging in the kind and degree of illegal gaming that the Tribe is.

ECF No. 147 at 11; *see also* ECF No. 147 at 12. Specifically, Counter-Defendant argues that bingo operations netting millions of dollars throughout the State of Texas, many of which operate outside the limitations of Texas law, cannot be compared to the gaming activity of bingo as conducted on the reservation and lands of the Ysleta del Sur Pueblo. Yet in discovery it denied knowing anything about this, and it has not presented any evidence on this issue in support of its motion for summary judgment. In any event, bigger bingo is not more of a gaming activity than is little bingo. Bingo is the gaming activity, and the issue. Because bingo is a gaming activity not prohibited by the laws of the State of Texas, it is a gaming activity that can be offered on the reservation and lands of the Ysleta del Sur Pueblo under the Restoration Act. Size does not matter. And because the Restoration Act prohibits regulation of bingo by this Counter-Defendant, and he is flaunting that restriction placed on him by Congress, the Counter-Defendant is denying these Counter-Plaintiffs their right to Equal Protection of the law.

## CONCLUSION

The Pueblo, its Governor and its Tribal Council respectfully ask the Court to deny the Counter-Defendant's Motion for Summary Judgment on the Counter Claim.

---

receipts from bingo in the State of Texas was deposited into the State of Texas's General Revenue Fund; in 2016, $13.9 million in gross receipts from bingo in the State of Texas was given to cities and counties; in 2016, $30 million in gross receipts from bingo in the State of Texas was given to charities for charitable purposes; and in 2016, 15.2 million people attended Texas bingo games.

Dated: December 5, 2018                    Respectfully Submitted,

*/s/ Randolph H. Barnhouse*
Randolph H. Barnhouse
BARNHOUSE KEEGAN SOLIMON & WEST LLP
7424 4th Street NW
Los Ranchos de Albuquerque, NM 87107
(505) 842-6123 (telephone)
(505) 842-6124 (facsimile)
dbarnhouse@indiancountrylaw.com

KEMP SMITH LLP
Richard Bonner
State Bar No. 02608500
Joseph Daniel Austin
State Bar No. 24101470
P.O. Box 2800
El Paso, TX  79999-2800
(915) 553-4424 (telephone)
(915) 546-5360 (facsimile)
Richard.Bonner@kempsmith.com
Joseph.Austin@kempsmith.com

*Attorneys for Defendants*