# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS,<br>    Plaintiff,<br><br>v.<br><br>YSLETA DEL SUR<br>PUEBLO, the TRIBAL<br>COUNCIL, and the<br>TRIBAL GOVERNOR<br>MICHAEL SILVAS or his<br>SUCCESSOR,<br>    Defendants.<br>--------------------<br>YSLETA DEL SUR<br>PUEBLO, the TRIBAL<br>COUNCIL, and the<br>TRIBAL GOVERNOR<br>MICHAEL SILVAS or his<br>SUCCESSOR,<br>    Counter-Plaintiffs,<br><br>v.<br><br>KEN PAXTON, in his<br>official capacity as Texas<br>Attorney General,<br>    Counter-Defendant. | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | EP-17-CV-179-PRM |

## MEMORANDUM OPINION AND ORDER GRANTING COUNTER-DEFENDANT KEN PAXTON'S MOTION FOR SUMMARY JUDGMENT

On this day, the Court considered Counter-Defendant Ken Paxton,

in his official capacity as the Attorney General's [hereinafter "Paxton"] "Motion for Summary Judgment" (ECF No. 147) [hereinafter "Motion"], filed on November 14, 2018; Counter-Plaintiffs Ysleta del Sur Pueblo, the Tribal Council, and Tribal Governor Michael Silvas or his Successor's [hereinafter, collectively, "Pueblo" or "the Tribe"] "Response in Opposition to Counter-Defendant Ken Paxton's Motion for Summary Judgment on Defendants' Counterclaim" (ECF No. 153) [hereinafter "Response"], filed on December 5, 2018; and Counter-Defendant Paxton's "Reply in Support of Counter-Defendant Ken Paxton's Motion for Summary Judgment" (ECF No. 158) [hereinafter "Reply"], filed on December 14, 2018, in the above-captioned cause. After due consideration, the Court is of the opinion that Paxton's Motion should be granted, for the reasons that follow.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

This case is the most recent chapter of a decades-long dispute between the State of Texas and the Tribe regarding gaming activities on Pueblo tribal land. In 1987, the Restoration Act restored a federal trust relationship and federal assistance to the Tribe. *See generally* Ysleta del Sur Pueblo and Alabama and Coushatta Indian Tribes of

Texas Restoration Act, Pub. L. No. 100-89, 101 Stat. 666 (1987). In relevant part, § 107(a) of the Restoration Act provides that "[a]ll gaming activities which are prohibited by the laws of the State of Texas are hereby prohibited on the reservation and on lands of the tribe." After the Restoration Act was enacted, litigation regarding the Tribe's gaming activities and the Restoration Act's meaning began quickly and has continued for more than twenty-five years.[1]

The current dispute involves bingo activities on the Tribe's reservation. Am. Compl., Aug. 15, 2017, ECF No. 8. According to the State, "[t]he Pueblo currently operates several thousand one-touch 'electronic bingo' slot machines, as well as an unlicensed 24/7 bingo operation, on its El Paso reservation." *Id.* at 1. The State asserts that the Tribe's activities violate Texas law and the Restoration Act; therefore, the State seeks to enjoin the Tribe's operations. *Id.* The Tribe, however, avers that its gaming operations are permissible forms of bingo. Pueblo Defs.' First Am. Counterclaim 18 [hereinafter "Counterclaim"], Sept. 7, 2018, ECF No. 121.

---

[1] Prior litigation occurred under cause numbers EP-93-CA-29 and EP-99-CV-320.

The Texas Constitution provides that "[t]he Legislature by law may authorize and regulate bingo games conducted by a church, synagogue, religious society, volunteer fire department, nonprofit veterans organization, fraternal organization, or nonprofit organization supporting medical research or treatment programs." TEX. CONST. Art. 3 § 47(b). The Bingo Enabling Act is the operative statute that enables charitable bingo in Texas. *See* TEX. OCC. CODE § 2001. The Bingo Enabling Act defines which types of organizations are allowed to conduct charitable bingo, provides parameters for bingo occasions, and discusses bingo licensing requirements. *Id.*

In its Counterclaim, the Tribe contends that the Texas Constitution and Bingo Enabling Act[2] violate the Equal Protection Clause "by allowing certain organizations the right to conduct bingo, but omitting Indian nations and their members from that list." Counterclaim 20. Additionally, the Tribe asserts that Paxton has

---

[2] The Bingo Enabling Act implements the provision in the Texas Constitution involving charitable bingo. Thus, for purposes of the Tribe's Equal Protection claims, their charitable bingo provisions rise and fall together. Hereafter, in the interest of brevity, the Court will refer to the list of charitable organizations as that found in the Bingo Enabling Act. The Court's discussion regarding the Bingo Enabling Act is duly applicable to the Texas Constitution.

enforced Texas's gaming laws in a discriminatory manner.  Specifically,
the Tribe contends that Paxton "has never brought suit against non-
Indians" to enforce gaming violations pursuant to the Texas Civil
Practice and Remedies Code but "has worked for years to stop bingo on
the Ysleta del Sur Pueblo" reservation.  *Id.* at 21–22.  Thus, the Tribe
seeks a declaration that Texas's Bingo Enabling Act and/or enforcement
of its gaming laws violate the Equal Protection Clause.  *Id.* at 23.

## II.   LEGAL STANDARD

### A.    Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(a), a court "shall
grant summary judgment if the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to judgment
as a matter of law."  A genuine dispute exists "if the evidence is such
that a reasonable jury could return a verdict for the nonmoving party."
*Rogers v. Bromac Title Servs., LLC*, 755 F.3d 347, 350 (5th Cir. 2014)
(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"Under Federal Rule of Civil Procedure 56(c), the party moving for
summary judgment bears the initial burden of . . . 'identifying those
portions of [the record] which it believes demonstrate the absence of a

genuine issue of material fact.'" *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Rule 56(c) mandates the entry of summary judgment . . . upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 323. Where this is the case, "there can be 'no genuine issue as to any material fact,' since complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* (quoting Rule 56(c)).

In adjudicating a motion for summary judgment, a court "consider[s] evidence in the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in favor of that party." *Bluebonnet Hotel Ventures, LLC v. Wells Fargo Bank, N.A.*, 754 F.3d 272, 276 (5th Cir. 2014).

## III.  ANALYSIS

In his Motion, Paxton seeks summary judgment on the Tribe's Counterclaim. Specifically, Paxton asserts that 42 U.S.C. § 1983 is the appropriate vehicle for alleging a constitutional claim and that the

Tribe is not a proper claimant pursuant to § 1983.  Mot. 6, Reply 2.

Additionally, Paxton contends that the Tribe's claims fail on their

merits because the Bingo Enabling Act is not unconstitutionally written

or enforced.  Mot. 9–10.

### A.  Whether the Tribe has a cause of action apart from § 1983

According to the Tribe, its Counterclaim "*does not include* a claim

under 42 U.S.C. § 1983" and, therefore, whether the Tribe is a proper

claimant pursuant to § 1983 is irrelevant.  Resp. 7.  The Tribe presents

two theories regarding how this case might be properly brought without

invoking § 1983.  First, the Tribe asserts that its claim is brought as

"Declaratory Judgment Act litigation."  *Id.* at 8.  Second, the Tribe

contends that "even if this were a 'stand alone' constitutional claim, it

would be proper."  *Id.*  For the following reasons, the Court is of the

opinion that the Declaratory Judgment Act does not provide an

independent cause of action and that the Tribe's claim may not be

brought as a freestanding constitutional claim.  Accordingly, § 1983 is

the proper vehicle for the Tribe's claim.

1.  <u>The Declaratory Judgment Act does not provide a cause of action.</u>

The Declaratory Judgment Act provides no independent cause of action. The operation of the Declaratory Judgment Act is "only 'procedural' . . . leaving 'substantive rights unchanged.'" *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 199 (2014) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937) and then *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 509 (1959)). Therefore, the Act "is not an independent source of federal jurisdiction; the availability of such relief presupposes the existence of a judicially remediable right." *Schilling v. Rogers*, 363 U.S. 666, 677 (1960) (internal citation omitted). Because the Declaratory Judgment Act provides no independent cause of action, the Tribe may not use the Act alone as a vehicle to bring its Equal Protection claim into federal court.[3]

----

[3] The Tribe contends that "the Court has confirmed" that this claim may be brought pursuant to the Declaratory Judgment Act. Resp. 8. Apparently, the Tribe believes that the Court determined that the Declaratory Judgment Act provides the Court with jurisdiction to hear an Equal Protection claim when the Court granted the Tribe leave to amend its Counterclaim. *See* Order Denying Defs.' Mot. to Dismiss and Granting in Part and Denying in Part Pl.'s Mot. to Dismiss 33–35, Aug. 27, 2018, ECF No. 115 (granting leave to amend). To the contrary, the Court specifically declined to discuss whether the Declaratory Judgment Act could be an appropriate vehicle for the Tribe's Equal

Rather, the Tribe must identify a substantive source.

> 2. The Tribe cannot bring a standalone Equal Protection
>    claim.

Further, the Tribe asserts that bringing this suit as a standalone constitutional claim is proper. Thus, the Court considers whether federal common law provides a cause of action for freestanding Equal Protection claims and determines that it does not.[4]

Courts have determined that "[t]he Equal Protection clause of the Fourteenth Amendment is not self-enforcing but requires application through some legislative act." *Zentgraf v. Texas A & M Univ.*, 492 F. Supp. 265, 270 (S.D. Tex. 1980) (citing *Katzenbach v. Morgan*, 384 U.S. 641, 649 (1966) and *Ex parte Virginia*, 100 U.S. 339, 345 (1880)); *see*

---

Protection claim. *Id.* at 34 n.16. Now, having fully considered the issue, the Court determines that the Declaratory Judgment Act does not supply a cause of action.

[4] Some scholars have argued that federal question jurisdiction should be understood to include the implied power to issue injunctive relief in constitutional cases, even without Congressional action. *See, e.g.,* John F. Preis, *In Defense of Implied Injunction Relief in Constitutional Cases*, 22 WM. & MARY BILL RTS. J. 1, 39 (2013). Nonetheless, even if courts could decide some constitutional questions based on an implied equitable power, case law supports that the Equal Protection Clause is not self-enforcing. Thus, it appears that courts would not have the authority to issue injunctive relief in this circumstance.

*also Johnson v. Sutter Delta Med. Ctr.*, No. C 11-03628 SI, 2011 WL 5444319, at *2 (N.D. Cal. Nov. 9, 2011) ("[T]he Fourteenth Amendment is not self-enforcing.  Rather, § 5 of the Fourteenth Amendment grants Congress the power to enact legislation with the purpose of enforcing the Fourteenth Amendment." (citing *City of Boerne v. Flores*, 521 U.S. 507, 518–19 (1997))).  Thus, an Equal Protection claim must be authorized by legislation and cannot be derived from the common law.

Notwithstanding case law to the contrary, the Tribe believes that the Court may decide its constitutional claim without Congressional authorization.  To support its contention, the Tribe cites *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) and *Davis v. Passman*, 442 U.S. 228 (1979).  Resp. 8.  It appears that the Tribe presumes these cases were brought as standalone constitutional claims; however, this belief is mistaken.  *Olech* was filed pursuant to § 1983, and *Davis* was brought under *Bivens*,[5] a federal common law analogue to § 1983.  *See* Br. for Resp. at 1–2, *Olech*, 528 U.S. 562 (stating that "Mrs. Olech

---

[5] *Bivens* provides an implied right of action for damages against federal officials that is similar but not identical to § 1983.  *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotic*s, 403 U.S. 388, 389 (1971).  This case is against a state—not federal—officer, so *Bivens* is not relevant here.  Rather, case law regarding § 1983 applies.

brought the lawsuit under 42 U.S.C. § 1983 to redress the violation of her rights under the Equal Protection Clause"); *Davis*, 442 U.S. at 248 (asserting that "as in *Bivens*, if petitioner is able to prevail on the merits, she should be able to redress her injury"). Thus, these cases do not support the Tribe's contention that courts may decide a standalone Equal Protection claim.

In sum, the Court is of the opinion that it has no authority to decide the Tribe's Equal Protection claim absent a legislative act. Accordingly, the Court must consider whether the Tribe may bring its claim pursuant to § 1983, which is the relevant statute that authorizes persons to bring a claim against a state actor who has violated their constitutional rights. Without such legislative authorization, the Court lacks authority to hear the claim.

### B. Whether the Tribe may proceed pursuant to § 1983

Having determined that § 1983 is the proper method of alleging an Equal Protection claim, the Court must determine whether the Tribe may proceed pursuant to § 1983.[6] Section 1983 "permits private

---

[6] Although the Tribe does not identify § 1983 as the source of its cause of action, the Court is of the opinion that § 1983 is the correct vehicle for

individuals to sue state actors to enforce constitutional rights as well as rights created by federal statutes." *Anderson v. Jackson*, 556 F.3d 351, 356 (5th Cir. 2009). Section 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other *person* within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983 (emphasis added). The key question here is whether the Tribe is a "person" who may bring a claim pursuant to § 1983. According to the State, the Tribe is not a proper claimant based on the Supreme Court's decision in *Inyo County*, a case which considers when an Indian tribe is a proper claimant pursuant to § 1983. Mot. 6–7.

In this section, the Court discusses *Inyo County* and circuit court cases interpreting it. Then, the Court determines that the Tribe may proceed on two of its three theories regarding why the State's action violates the Tribe's constitutional rights.

---

an Equal Protection claim. Accordingly, the Court analyzes this claim pursuant to § 1983.

1. <u>The Supreme Court's decision in *Inyo County*</u>

In *Inyo County*, the Supreme Court determined that the Paiute-Shoshone Indian Tribe "does not qualify as a 'person' who may sue under § 1983." *Inyo Cty., Cal. v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony*, 538 U.S. 701, 704 (2003). There, the local district attorney's office obtained a search warrant to secure payroll records of employees who worked at a casino run by the Tribe as part of a welfare fraud investigation. *Id.* at 705. The Tribe sued in federal court and alleged, among other things, that the search violated the Tribe's right to self-governance because the Tribe, as a sovereign, is immune from state processes. *Id.* at 706.

In determining that the Tribe could not bring a § 1983 suit, the Supreme Court reasoned that § 1983 "was designed to secure private rights against government encroachment, . . . not to advance a sovereign's prerogative to withhold evidence relevant to a criminal investigation." *Id.* at 712 (internal citation omitted). Accordingly, the Court determined that "the Tribe may not sue under § 1983 to vindicate the sovereign right it here claims." *Id.*

In some circumstances, a sovereign may qualify as a person. In

reaching its decision, the Supreme Court considered cases regarding when a sovereign is a "person" able assert a claim pursuant to a federal statute. *Id.* at 711. Specifically, a sovereign acting as a purchaser may qualify as a "person." *See State of Ga. v. Evans*, 316 U.S. 159, 162 (1942) (determining that a state acting as a purchaser is a "person" for purposes of the Sherman Act); *Pfizer, Inc. v. Gov't of India*, 434 U.S. 308, 320 (1978) (determining that a foreign nation is a "person" who may seek treble damages as afforded by federal antitrust laws). Accordingly, the Supreme Court's reasoning suggests that a sovereign may qualify as a "person" if the sovereign is asserting a right that a nonsovereign entity could have asserted.

2. Cases Interpreting *Inyo County*

The Fifth Circuit has not yet addressed *Inyo County*'s scope or application. The Sixth, Ninth, and Tenth Circuits have had the opportunity to consider the scope of *Inyo County* and determine whether a Tribe's § 1983 claim should be barred.

a. Sixth Circuit: *Keweenaw Bay Indian Community*

"[W]hether a sovereign entity may be considered a 'person' depends on the specific rights that it is asserting." *Keweenaw Bay*

*Indian Cmty. v. Rising*, 569 F.3d 589, 595 (6th Cir. 2009). In *Keweenaw Bay*, the Indian Community asserted that Michigan had violated its constitutional rights when the State "offset" federal funds that the Community was entitled to in order to collect back taxes that the State asserted the Community owed. *Id.* The district court had determined that the Community could not proceed based on the Supreme Court's decision in *Inyo County*. The Sixth Circuit stated that:

> There are at least two plausible ways to interpret the Court's *Inyo County* decision. First, it could be that a tribe is not a "person" within the meaning of § 1983 whenever it sues to vindicate rights that are rooted in its status as a sovereign, or have some connection to its sovereignty. Second, it could be that a tribe is not a "person" only when it sues to vindicate its sovereign immunity specifically, as in *Inyo County*.

*Id.* at 596. The Sixth Circuit did not decide which of its articulated interpretations was best but determined that "the District Court erred under either reading." *Id.* The Sixth Circuit remanded the case for the district court "to determine whether the Community was entitled to the federal funds (a) only as a result of its sovereignty, or (b) simply because it provides certain social services."[7] *Id.* According to the Sixth Circuit,

---

[7] On remand, the case settled before the district court had the opportunity to further consider the issue. *See generally* 2:05-CV-224 (W.D. Mich).

if the Community was entitled to funds simply because it provides social services, then a "§ 1983 suit would not be in any way dependent on its status as a sovereign, and it should be considered a 'person' within the meaning of that statute, so long as other private, nonsovereign entities could likewise sue under § 1983." *Id.*

        b.    Ninth Circuit: *Skokomish Indian Tribe*

In *Skokomish Indian Tribe v. United States*, the Ninth Circuit determined that the Skokomish Tribe could not bring an action against a public utility company pursuant to a treaty regarding tribal lands and § 1983. 410 F.3d 506 (9th Cir. 2005). The Ninth Circuit reasoned that "the Tribe is attempting to assert communal fishing rights reserved to it, as a sovereign, by a treaty it entered into with the United States." *Id.* at 514–15. Thus, the Tribe was not acting in any capacity resembling a "private person." *Id.* at 515 (citing *Inyo County*, 538 U.S. at 712). Instead, because the Tribe was asserting treaty-based rights, the rights at issue could not "give rise to individual actions," and the Ninth Circuit asserted that the Tribe could not sue to "vindicate communal, rather than individual rights." *Id.* at 515–16.

c.     Tenth Circuit: *Muskogee (Creek) Nation*

In *Muskogee (Creek) Nation v. Oklahoma Tax Commission*,
Muskogee (Creek) Nation—an Indian Nation—sued Oklahoma after
Oklahoma's tax commission directed the state highway patrol to stop
Muskogee vehicles in order to inspect cigarettes and seize any
cigarettes that did not bear a tax stamp in compliance with a state
statutory scheme.  611 F.3d 1222, 1225–25 (10th Cir. 2010).  The
Nation asserted that its Fourth Amendment rights were violated by the
highway patrol because of its sovereign immunity.  *Id.*

The Tenth Circuit reasoned that the Supreme Court suggested
"that an Indian tribe's status as a sovereign entity did not *per se*
foreclose its ability to bring suit as a 'person' under § 1983.  Instead, the
viability of a tribe's § 1983 suit depended on whether the tribe's
asserted right was of a sovereign nature."  *Id.* at 1234 (citing *Inyo
County*, 538 U.S. at 711).  Because "[n]o exemption from the state's
statutory scheme based on Indian commerce would be available to [the
Tribe] suing as a non-sovereign 'person,'" the Tenth Circuit determined
that the claim was one seeking to vindicate sovereign rights.  *Id.* at
1235–36.  Thus, the Tribe was unable to proceed pursuant to § 1983.

### 3.  Application of *Inyo County* to this Case

After considering *Inyo County* and the case law interpreting it, the Court concludes that the following test should be applied:  If a Tribe could not bring its claim if it were not a sovereign, then the claim should be barred by *Inyo County*.  Thus, claims that are based on Tribal treaties, sovereign immunity, or other privileges granted only to sovereigns should be barred.  On the other hand, if the claim is one that nonsovereign entities in similar situations could bring—even if the claim has some relation to the Tribe's sovereignty—then *Inyo County* should not preclude the claim.

Even if *Inyo County* does not bar the Tribe's claims outright, *Inyo County* does affect how the Tribe may support its claims.  That is, the Tribe may not rely on any alleged sovereign rights in proving its claims because the Tribe would effectively be suing to vindicate sovereign rights.  *See Inyo Cty.*, 538 U.S. at 712 (determining that although "a tribal member complaining of a Fourth Amendment violation would be a 'person' qualified to sue under § 1983," the tribal member—"like other private persons"—could not assert a right to immunity).  In this case, the Tribe contends that it has a "fundamental sovereign right to engage

in gaming on the reservation." Resp. 8. However, *Inyo County* makes clear that Indian tribes may not use § 1983 to enforce sovereign rights. Therefore, the Court declines to determine whether any enforceable sovereign right to engage in gaming exists.[8]

Below, the Court considers whether the Tribe's theories regarding Texas's alleged Equal Protection violations assert sovereign or nonsovereign rights. Ultimately, the Court concludes that two of the Tribe's theories—that the Bingo Enabling Act is discriminatory and that the State has enforced its gaming law in a discriminatory way—could plausibly be asserted by a nonsovereign entity. Thus, the Court determines that these theories should be evaluated on their merits. On the other hand, the Court determines that the Tribe's assertion that the State has unlawfully expanded its regulatory reach is inextricably tied to the Tribe's sovereignty and that the Tribe may not pursue this claim.

---

[8] The Court expresses no opinion regarding whether Indian tribes have a fundamental right to engage in gaming. Because *Inyo County* commands that a § 1983 suit brought by a Tribe may not be used to vindicate sovereign rights, the Court believes that whether the Tribe could assert a fundamental right to engage in gaming is irrelevant.

### i. *Claim that the statutory scheme is discriminatory*

First, the Tribe contends that "[t]here is no legitimate reason for excluding Indian Tribes from the Texas constitutional and statutory classification of entities allowed to conduct the gaming activity of bingo." Resp. 10. Thus, according to the Tribe, the State unlawfully discriminated against Indians when it drafted the charitable bingo exemption. *Id.* at 11. A nonsovereign charitable entity could plausibly assert that it was discriminated against when the Texas legislature did not include it in the list of organizations authorized to conduct bingo. Accordingly, the Court believes that this claim may be decided on its merits.

### ii. *Claim regarding discriminatory enforcement*

Next, the Tribe asserts that the State's enforcement scheme is discriminatory. Resp. 14–15. The Tribe contends that Paxton "has never brought suit against non-Indians" to enforce gaming violations but "has worked for years to stop bingo on the Ysleta del Sur Pueblo" reservation. Counterclaim 21–22. Further, the Tribe avers that the State has discriminated against Indian tribes because Texas's Office of the Attorney General initiates suits against Indian tribes, whereas

"everyone else in the state is subject to the legal oversight of local district attorneys."  Resp. 14.

A district court in California has considered whether a tribe could bring an Equal Protection claim against a state regarding the state's enforcement of gaming laws.  In *Fort Independence Indian Community v. California*, the Community alleged that California violated the Equal Protection Clause by denying the Community "special privileges and/or immunities" that the State had extended other tribes.  No. CIVS08432LKK/KJM, 2008 WL 6137129, at *5 (E.D. Cal. Sept. 10, 2008).  The court determined that the tribal plaintiff asserted an interest "that a similarly situated private party would not enjoy" and that its Equal Protection claim was thus outside the scope of § 1983.  *Id.*

In this case, the Tribe asserts that it is being treated differently than other, *nontribal* entities that offer gambling.  Thus, the Tribe's claims are distinguishable from the claims at issue in *Fort Independence*.  A nonsovereign entity could bring a similar claim alleging that the State's enforcement structure violated its rights and singled it out for special treatment.  Thus, the Court is of the opinion that the Tribe's claim regarding enforcement should also be considered

on its merits.

iii.   *Claim regarding the State's regulatory reach*

Finally, the Tribe contends that its Equal Protection rights are violated because Congress has the "plenary power . . . to deal with the unique issues concerning Indian nations" and because Texas "seeks to unlawfully expand [its] regulatory reach." Resp. 12–14. The Tribe further asserts that Texas's allegedly expansive reach prohibits the Tribe from "exercising a fundamental right"—that is, the right to engage in gaming—"guaranteed to them by Congress." *Id.* at 14.

Whether the Tribe could allege any Equal Protection theory based on this point is not entirely clear, as its claim appears to be rooted in preemption. At any rate, to the extent that any cognizable Equal Protection theory exists regarding Congress's plenary power to regulate Indian tribes, the claim is based in the Tribe's belief that it, as a sovereign, has a right to engage in gaming. The Tribe has not alleged any Equal Protection claim that a nonsovereign entity could bring regarding the State's regulatory reach. Thus, the Court concludes that *Inyo County* bars the Tribe from pursuing a § 1983 claim based on this theory.

## C.  Evaluation of the Tribe's Equal Protection Claims

### 1.  Claim that the Bingo Enabling Act is discriminatory

The Tribe asserts that the Bingo Enabling Act violates the Equal Protection Clause because the State has allowed some charitable entities to conduct bingo but declines to include Indian tribes on the list.  For the reasons discussed below, the Court is of the opinion that rational basis scrutiny applies and that a rational basis exists for the Bingo Enabling Act's charitable exception.  Thus, the Bingo Enabling Act's charitable exception does not violate the Equal Protection Clause.

#### a.  *Rational basis scrutiny applies.*

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  When determining whether legislation violates the Equal Protection Clause, "[t]he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate

state interest." *Id.* at 440. However, some exceptions to the general rule exist, and statutes that fall under one of the exceptions are afforded a heightened standard of review.

Heightened scrutiny will be applied if a statute facially discriminates against a suspect class—i.e., if the statute discriminates on the basis of race, national origin, or sex. *See id.* ("[W]hen a statute classifies by race, alienage, or national origin," the law should be "subjected to strict scrutiny and will be sustained only if [it is] suitably tailored to serve a compelling state interest."); *Lewis v. Ascension Par. Sch. Bd.*, 806 F.3d 344, 354 (5th Cir. 2015) ("'Laws that explicitly distinguish between individuals on racial grounds fall within the core of that prohibition,' and are subject to strict scrutiny." (quoting *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999)). Further, a law that is facially neutral may be subject to strict scrutiny, but "only if the neutral law has a 'disproportionately adverse effect' that 'can be traced to a discriminatory purpose.'" *Id.* (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979)).

Here, the Tribe asserts that, because legislation that singles out Native Americans or relies on classifications based on Native American

heritage is analyzed based on a strict scrutiny level of review, the Bingo

Enabling Act's charitable exception should be afforded strict scrutiny.

Resp. 4.  However, the Bingo Enabling Act does not single out Native

Americans (or any other suspect class) for special treatment.  *See*

*generally* TEX. CONST. Art. 3 § 47(b) (providing that "bingo games

conducted by a church, synagogue, religious society, volunteer fire

department, nonprofit veterans organization, fraternal organization, or

nonprofit organization supporting medical research or treatment

programs"); TEX. OCC. CODE § 2001.  Rather, the law is facially neutral.

Thus, in order to establish that strict scrutiny applies, the Tribe

must show that the statute has a disproportionate effect on Native

Americans and that the adverse effect can be traced to a discriminatory

purpose.  Yet, the Tribe has failed to put forward any evidence showing

that the Bingo Enabling Act has a discriminatory purpose.

Additionally, the Court notes that charitable organizations on tribal

lands are permitted to apply for a license to conduct charitable bingo,

just like a charitable organization in any other community is able to

apply for a license to conduct bingo.  In fact, the Pueblo volunteer fire

department has obtained a bingo license from Texas.  Mot. Ex. A (Hisa

Dep. Tr. 49:2–3). Thus, it appears that the State did not leave tribes off the list in order to prevent tribal organizations from engaging in fundraising. To the contrary, tribal entities that meet the State's facially neutral criteria may conduct charitable bingo. Accordingly, the Tribe has not shown that Texas's laws regarding bingo discriminate against a suspect class.

In addition to applying strict scrutiny when a statute discriminates against a suspect class, courts have found that statutes impinging on certain fundamental rights—e.g., interstate travel, parental rights, and marriage—may be subject to strict scrutiny. *See, e.g., Shapiro v. Thompson*, 394 U.S. 618 (1969) (interstate travel), *M.L.B. v. S.L.J.*, 519 U.S. 102 (1996) (parental rights), *Loving v. Virginia*, 388 U.S. 1 (1967) (marriage). Jurisprudence regarding fundamental rights "specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." *Washington v. Glucksberg*, 521 U.S. 702, 703 (1997).

The Tribe asserts that it possesses a sovereign right to engage in gaming. Resp. 8. However, as previously discussed, the Court declines to consider whether Indian tribes enjoy any fundamental right to

engage in gaming, as this alleged right is rooted in sovereignty and is not a right that may be enforced pursuant to § 1983. Significantly, the Tribe does not contend that the Bingo Enabling Act violates any traditionally recognized fundamental right. Accordingly, the Court is of the opinion that the Bingo Enabling Act does not impinge on an enforceable fundamental right and should not be subject to strict scrutiny on this basis.

In sum, the statute does not classify on the basis of race, and the Tribe has not shown that it otherwise has a discriminatory purpose. Further, the Tribe has not alleged that the statute impinges upon any enforceable fundamental right. Accordingly, the Court is of the opinion that a rational basis standard of review should apply.[9]

---

[9] The Tribe points out that, in a different context, the Fifth Circuit considered a provision in the Bingo Enabling Act and applied a strict scrutiny standard of review. Resp. 3 (citing *Dep't of Texas, Veterans of Foreign Wars of U.S. v. Texas Lottery Comm'n*, 760 F.3d 427, 433 (5th Cir. 2014)). Thus, according to the Tribe's logic, strict scrutiny should apply here as well. However, the Fifth Circuit considered whether a political advocacy restriction regarding the use of funds raised during the course of bingo games violated the First Amendment. 760 F.3d at 430–31. Having determined that the restrictions burdened political speech and were afforded strict scrutiny pursuant to First Amendment case law, the Fifth Circuit determined that the provision violated the First Amendment. *Id.* at 438–39. The legal framework for analyzing First Amendment claims is distinct from the framework for analyzing

b.    *A rational basis exists for the charitable bingo exception.*

When a rational basis standard of review applies,

> courts have been very reluctant, as they should be in our federal system and with our respect for the separation of powers, to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued. In such cases, the Equal Protection Clause requires only a rational means to serve a legitimate end.

*City of Cleburne*, 473 U.S. at 441–42. Thus, having determined that a rational basis standard of review applies, the Court considers whether the bingo exception is rationally related to a legitimate state interest.

The purpose of the Bingo Enabling Act is to increase charities' ability to raise revenues "so that [charities] can assist and provide much needed services in our communities." STATE OF TEXAS, REPORT OF THE SENATE INTERIM COMM. ON CHARITABLE BINGO, 75th Sess., at 21 (1996). Thus, it appears that the Texas legislature determined that religious groups, volunteer fire departments, nonprofit veterans' organizations, fraternal organizations, and nonprofit organizations supporting medical research or treatment are charities that provide important services in

Equal Protection claims. Thus, the Fifth Circuit's decision has little to do with the case at hand.

Texas communities. Promoting private charitable giving is a legitimate government interest, and allowing community organizations to raise funds via bingo is a rational means to achieve that end.

To be clear, the list of organizations authorized to conduct bingo may not be an exhaustive list of all types of charities that provide services to a community. The Tribe appears to believe that, because the State did not include Indian tribes on the list of organizations that may conduct bingo, the Bingo Enabling Act does not serve a legitimate purpose. Resp. 10 (stating that "[t]here is no legitimate reason for excluding Indian Tribes from the Texas constitutional and statutory entities allowed to conduct the gaming activity of bingo"). However, the Court is not tasked with determining whether the State drafted the best, or most inclusive, list of organizations that support and provide services to communities. Instead, the Court considers whether a rational basis exists for the State's decision. Since the exempted organizations are charitable organizations that provide services to a community, a rational basis for the list of organizations exists. Accordingly, the Court is of the opinion that summary judgment should be granted in the State's favor on this claim.

## 2. Claim regarding discriminatory enforcement

Further, the Tribe avers that the State's enforcement of the Bingo Enabling Act is discriminatory. Specifically, the Tribe asserts that similarly situated entities are not prosecuted for gaming violations. Resp. 18. Additionally, the Tribe contends that, while Paxton's centralized office—the Office of the Attorney General—has initiated litigation against Indian tribes, "everyone else in the state is subject to the legal oversight of local district attorneys." Resp. 14. For the reasons provided below, the Court is of the opinion that summary judgment should be granted in the State's favor regarding the Tribe's discriminatory enforcement claims.

### a. *The Tribe has not put forward evidence that a similarly situated comparator exists.*

The Equal Protection Clause protects the right to be free from discriminatory enforcement of the law. In order to prove discrimination, a litigant must show that they have been treated differently than others who are similarly situated. *Zayre of Georgia, Inc. v. City of Marietta*, 416 F.2d 251, 254 (5th Cir. 1969) ("The federal courts have no general supervisory power over the operation of state and local governments. . . . A showing of discrimination rests, in turn,

on a difference in treatment as between those similarly situated."). "To be a 'class of one,'[10] the plaintiff must establish (1) he was intentionally treated differently from others similarly situated and (2) there was no rational basis for any such difference." *Wilson v. Birnberg*, 667 F.3d 591, 599 (5th Cir. 2012) (internal quotation marks and citations omitted). "[A]t a minimum," a plaintiff must "show he 'has been intentionally treated differently from others similarly situated.'" *Williams v. Riley*, 275 F. App'x 385, 390 (5th Cir. 2008) (quoting *Olech*, 528 U.S. at 564).

The Tribe has not put forward any evidence demonstrating that a similarly situated comparator exists. In its Counterclaim, the Tribe identifies entities that the Tribe believes operate gaming rooms. Counterclaim 15–18. However, the Tribe has failed to produce *any* summary judgment evidence supporting its averments that these entities operate gaming rooms.[11]

---

[10] When a litigant asserts that he has been singled out for discriminatory treatment, courts refer the claim as a "class of one" Equal Protection claim.

[11] Further, the Tribe contends that the size of other entities' operations should not matter for an Equal Protection analysis. Specifically, the Tribe contends that "bigger bingo is not more of a gaming activity than

The Tribe appears to believe that it need not produce evidence showing that other entities have engaged in gaming. Instead, the Tribe attempts to shift the burden of producing evidence regarding its claims to the State. Resp. 19. The Tribe contends that the State has offered "not a single piece of evidence to contradict the averments in the Counter Claim setting forth in detail the operation of bingo halls throughout Texas that go unchallenged." *Id.*

Nonetheless, the Tribe cannot shift the burden of production to the State. In this case, "[t]he 'burden of production at trial ultimately rests on the [Tribe;]'" thus, "the movant[12] must merely show an 'absence of evidentiary support in the record for the nonmovant's case.'" *Sanchez v. Young Cty., Texas*, 866 F.3d 274, 279 (5th Cir. 2017) (quoting *Cuadra v. Houston Indep. Sch. Dist.*, 626 F.3d 808, 812 (5th Cir. 2010)), *cert. denied sub nom. Sanchez v. Young Cty., Tex.*, 139 S. Ct. 126 (2018).

---

is little bingo. . . . Size does not matter." Resp. 20. The Court disagrees and notes that the scope of an alleged violation would be relevant in determining whether entities were similarly situated. Nonetheless, regardless of whether the operations are similar in scope, the Tribe has not produced any evidence demonstrating that other entities are violating the State's gaming laws.

[12] The State is the movant, and the Tribe is the nonmovant.

"The nonmoving party must [] come forward with specific facts showing that there is a genuine issue for trial.  And though we draw justifiable inferences in favor of the nonmovant, the nonmovant must put forward sufficient evidence to enable us to draw this inference."  *Id.* (internal citation omitted).  Parties may not rely on bare factual averments in their pleadings as evidence, as "unsubstantiated assertions are not competent summary judgment evidence."  *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

Here, the Tribe has not provided any evidence that would tend to show that other, similarly situated entities are violating the State's gaming laws without being prosecuted for the violation.  Thus, the Tribe fails to identify a genuine issue of fact for trial, and the Court determines that summary judgment should be granted in the State's favor on this issue.

        b.      *A rational basis exists for the State's decision to have the Attorney General—rather than local prosecutors—file this action against the Tribe.*

Finally, the Tribe asserts that Paxton has violated the Tribe's constitutional rights because the Office of the Attorney General prosecutes the Pueblo's gaming violations, whereas local district

attorneys' offices prosecute nontribal entities' gaming violations. Resp. 14. On the other hand, the State contends that the reason that the Attorney General bring suits against Indian tribes, is "embedded in the structure of the Texas Constitution." Resp. 12. According to the State, gaming violations are typically prosecuted as criminal actions initiated by local county or district attorneys. *Id.* at 13. However, pursuant to the Restoration Act, "Texas has limited authority to halt violations of gaming laws on the Tribe's reservation, with this suit being the primary, if not sole, method of doing so." *Id.* at 13–14.

Considering the limitations imposed by the Restoration Act, it appears that the State's county and district attorneys could not pursue an action against the Tribe in the manner that they typically pursue actions against other entities—that is, via a state-court criminal action. *See* Restoration Act § 107(c) (providing that "the courts of the United States shall have exclusive jurisdiction over any offense in violation of subsection (a) that is committed by the tribe, or by any member of the tribe, on the reservation or on lands of the tribe"). It is unclear to the Court whether the State's local criminal prosecutors have the authority to file civil actions in federal court on behalf of the State. However,

even if local attorneys do possess the authority to file suits on the State's behalf in federal court, the Restoration Act precludes the State from bringing this suit in the way that it typically pursues lawsuits regarding gaming violations. Specifically, Texas may not pursue a state-court criminal action regarding the Tribe's gaming operations. Thus, a rational basis exists for prosecuting actions against the Pueblo differently than actions against other entities.

Additionally, the Tribe contends that Paxton has determined that local officials should not initiate actions against Indian tribes because of a lack of political will from local leaders. Resp. 15. Thus, it appears that the Tribe believes that the State has no legitimate reason for determining that the Office of the Attorney General should initiate these suits. To support its point, the Tribe relies on oral argument that occurred in a prior hearing in this litigation. During argument, in response to a question posed by the Magistrate Judge regarding whether a civil suit in federal court is the sole remedy allowed by Restoration Act, Texas's attorney stated,

> I think there's a reason that Congress set it up this way. I think that you might have a situation – and I'm not specifically saying that it's happening here or not happening here.

But you might have a situation where you have within a local community the elected district attorneys and county attorneys may be hesitant to enforce these provisions against tribes which are important members of those communities and that there may be some political will there, and that Congress was hoping to reserve to the State of Texas, an independent sovereign, the right to have its laws enforced regardless of what local elected officials choose to do.

Resp. Ex. E (Prelim. Inj. Hearing Tr. 37:20–38:11). Statements made by an attorney who is not under oath are arguments, not evidence. Thus, the Tribe has not proffered any admissible evidence to support its contention that Paxton is making decisions based on political will. In addition, the attorney was offering a hypothetical reason regarding why Congress may have drafted the Restoration Act in the fashion that it did, and the attorney was not offering a statement regarding why Texas's Office of the Attorney General has chosen to bring this action against the Tribe.

Moreover, even if the Tribe offered admissible evidence showing that the State considers political aims in determining who should prosecute an action, the Tribe has failed to provide any authority suggesting that it would be constitutionally improper for the State to consider local officials' political will. Rather, it appears that the State's policy would further the legitimate governmental interest of ensuring

that Texas's laws are enforced.

In sum, because of the limitations imposed by the Restoration Act, the State must initiate actions regarding the Pueblo's alleged gaming violations in a different manner than the State's normal practice in initiating actions against other entities that are not covered by the Restoration Act. Thus, Paxton has a rational basis for using the centralized Attorney General's office to pursue this action: he endeavors to follow the Restoration Act, which is federal law. Having determined that a rational basis exists, the Court is of the opinion that Texas's structure for prosecuting alleged gaming violations does not violate the Equal Protection Clause.

## IV. CONCLUSION

Accordingly, **IT IS ORDERED** that Counter-Defendant Ken Paxton, in his official capacity as the Attorney General's "Motion for Summary Judgment" (ECF No. 147) is **GRANTED**.

**SIGNED** this __11__ day of **February, 2019**.

PHILIP R. MARTINEZ
UNITED STATES DISTRICT JUDGE