## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| **STATE OF TEXAS,**<br>     **Plaintiff,**<br><br>**v.**<br><br>**YSLETA DEL SUR**<br>**PUEBLO, the TRIBAL**<br>**COUNCIL, and the**<br>**TRIBAL GOVERNOR**<br>**MICHAEL SILVAS or his**<br>**SUCCESSOR,**<br>     **Defendants.**<br>-------------------<br>**YSLETA DEL SUR**<br>**PUEBLO, the TRIBAL**<br>**COUNCIL, and the**<br>**TRIBAL GOVERNOR**<br>**MICHAEL SILVAS or his**<br>**SUCCESSOR,**<br>     **Counter-Plaintiffs,**<br><br>**v.**<br><br>**KEN PAXTON, in his**<br>**official capacity as Texas**<br>**Attorney General,**<br>     **Counter-Defendant.** | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | **EP-17-CV-179-PRM** |

## <u>MEMORANDUM OPINION AND ORDER</u>

On this day, the Court considered Plaintiff State of Texas's

"Motion for Summary Judgment and Permanent Injunction" (ECF No.

146) [hereinafter "Motion"], filed on November 14, 2018; Defendants Ysleta del Sur Pueblo, the Tribal Council, and the Tribal Governor Michael Silvas or his Successor's [hereinafter "Pueblo" or "the Tribe"] "Response to Texas' Motion for Summary Judgment and Permanent Injunction" (ECF No. 154) [hereinafter "Response"], filed on December 5, 2018; and Plaintiff State of Texas's "Reply in Support of Texas's Motion for Summary Judgment and Permanent Injunction" (ECF No. 157) [hereinafter "Reply"], filed on December 14, 2018. After due consideration, the Court is of the opinion that the Motion should be granted, for the reasons that follow.

## I.    BACKGROUND

### A.    History of the Restoration Act

In 1968, the United States Congress simultaneously recognized the Pueblo as a tribe and transferred any trust responsibilities regarding the Tribe to the State of Texas. S. Rep. No. 100-90 (1987), at 7. After the trust relationship was created, Texas held a 100-acre reservation in trust for the Tribe. *Id.* However, in 1983, Texas Attorney General Jim Mattox issued an opinion in which he concluded that the State may not maintain a trust relationship with an Indian

Tribe. Jim Mattox, *Opinion Re: Enforcement of the Texas Parks and Wildlife Code within the Confines of the Alabama-Coushatta Indian Reservation*, No. JM-17 (March 22, 1983). Mattox opined that a trust agreement with Indian tribes discriminates between members of a tribe and other Texas citizens on the basis of national origin in violation of the Texas Constitution. *Id.* Therefore, Mattox determined that no proper public purpose existed for the trust. *Id.* Accordingly, the Pueblo, alongside the Alabama-Coushatta Tribe in East Texas, sought to establish a federal trust relationship with the United States government. *See* S. Rep. No. 100-90 (1987), at 7.

In 1985, the House of Representatives, seeking to establish a federal trust relationship with the Tribe, passed House Resolution 1344 ("H.R. 1344"). Section 107 provided that:

> Gaming, lottery or bingo on the tribe's reservation and tribal lands shall only be conducted pursuant to a tribal ordinance or law approved by the Secretary of the Interior. Until amended as provided below, the tribal gaming laws, regulations, and licensing requirements shall be identical to the laws and regulations of the State of Texas regarding gambling, lottery and bingo.

131 Cong. Rec. H12012 (daily ed. Dec 16, 1985) (H.R. 1344 as passed by the House). However, several Texas officials remained concerned that

3

the bill would allow high-stakes gaming on the Tribe's reservation.

Thus, in 1986, the Tribe enacted Tribal Resolution No. TC-02-86[1] which, in relevant part, provided:

> WHEREAS, the Ysleta del Sur Pueblo has no interest in conducting high stakes bingo or other gambling operations on its reservation, regardless of whether such activities would be governed by tribal law, state law or federal law; and,
> . . .
> WHEREAS, the Ysleta del Sur Pueblo remains firm in its commitment to prohibit outright any gambling or bingo in any form on its reservation; and,
> . . .
> WHEREAS, although the Tribe, as a matter of principle, sees no justification for singling out the Texas Tribes for treatment different than that accorded other Tribes in this country, the Tribe strongly believes that the controversy over gaming must not be permitted to jeopardize this important legislation, the purpose of which is to ensure the Tribe's survival, protect the Tribe's ancestral homelands and provide the Tribe with additional tools to become economically and socially self-sufficient;
> NOW, THEREFORE, BE IT RESOLVED, that the Ysleta del Sur Pueblo respectfully requests its representatives in the United States [Senate] and House of Representatives to amend [§ 107] by striking all of that section as passed by the House of Representatives and substituting in its place language which would provide that all gaming, gambling, lottery, or bingo, as defined by the laws and administrative regulations of the State of Texas, shall be prohibited on the Tribe's reservation or on tribal land.

---

[1] A Tribal Resolution appears to be a way for a Tribe to communicate official opinions on political or public matters.

Thereafter, H.R. 1344 was introduced in the Senate, and the Senate modified § 107 to provide that "[g]aming, gambling, lottery or bingo, as defined by the laws and administrative regulations of the State of Texas is hereby prohibited on the tribe's reservation and on tribal lands." 132 Cong. Rec. S13634 (daily ed. Sept. 25, 1986) (H.R. 1433 as passed by the Senate). Thereafter, the bill died. *See* 132 Cong. Rec. S13735 (daily ed. Sept. 25, 1986).

A new bill was introduced, and in 1987, Congress enacted the Restoration Act to restore a federal trust relationship and federal assistance to the Tribe.[2] *See generally* Ysleta del Sur Pueblo and Alabama and Coushatta Indian Tribes of Texas Restoration Act, Pub. L. No. 100-89, 101 Stat. 666 (1987). In relevant part, § 107(a) of the Restoration Act provides that "[a]ll gaming activities which are prohibited by the laws of the State of Texas are hereby prohibited on the reservation and on lands of the tribe." Subsection (a) also incorporates the aforementioned Tribal Resolution by reference, adding that the statute's gaming provisions are drafted "in accordance with the

---

[2] For a more detailed account of the Restoration Act's legislative history, see *Ysleta del Sur Pueblo v. State of Texas*, 36 F.3d 1325 (5th Cir. 1994).

tribe's request in Tribal Resolution No. T.C.-02-86." Subsection (b) provides that "[n]othing in [§ 107] shall be construed as a grant of civil or criminal regulatory jurisdiction to the State of Texas." Finally, subsection (c) describes the Act's enforcement mechanisms and gives the "United States . . . exclusive jurisdiction over any offense in violation of subsection (a)." Further, it provides that "nothing in [§ 107] shall be construed as precluding the State of Texas from bringing an action in the courts of the United States to enjoin violations of the provisions of this section."

## B.    Prior Litigation Regarding Gaming on the Pueblo Reservation

### 1.    *Ysleta I*

In 1993, the Tribe sued the State and argued that, pursuant to the Indian Gaming Regulatory Act ("IGRA")[3], the State had failed to negotiate in good faith to form a Tribal-State compact concerning

---

[3] IGRA is a statute that governs gaming on myriad Indian reservations throughout the country. 25 U.S.C. §§ 2701, et seq. IGRA divides gaming into "class I," "class II," and "class III" gaming activities; whether a specific type of gaming is allowed on a reservation and how the gaming is regulated depends on which class of gaming activity is applicable. *See id.* §§ 2703, 2710. Additionally, IGRA requires that states negotiate in good faith if a tribe that wishes to engage in class III gaming requests such negotiations. *Id.* § 2710(d)(3)(a).

gaming on the Pueblo reservation. *Ysleta Del Sur Pueblo v. State of Tex.*, 852 F. Supp. 587, 590 (W.D. Tex. 1993), *rev'd*, 36 F.3d 1325 (5th Cir. 1994). The district court applied IGRA and concluded that the State was required to negotiate in good faith with the Tribe regarding casino-type gaming. *Id.* at 597. Further, the district court did not believe that the Restoration Act should have any effect on the relief that the Tribe requested. *Id.*

However, on appeal, the Fifth Circuit reversed the district court and determined that the Restoration Act—not IGRA—governs Pueblo gaming. *Id.* at 1332–33. *Ysleta del Sur Pueblo v. State of Texas* ("*Ysleta I*"), 36 F.3d 1325 (5th Cir. 1994). Specifically, the Fifth Circuit decided that "the Tribe has already made its 'compact' with the State of Texas, and the Restoration Act embodies that compact." *Id.* at 1335. Moreover, the Fifth Circuit stated that, pursuant to the Restoration Act, "Texas's laws and regulations [] operate as surrogate federal law on the Tribe's reservation." *Id.* at 1334.

In reaching this conclusion, the Fifth Circuit rejected the Tribe's argument that the Restoration Act should be read to incorporate the Supreme Court's decision in *California v. Cabazon Band of Mission*

*Indians*, 480 U.S. 202 (1987).  *Id.* at 1334–34.  In *Cabazon Band*, which

was decided six months prior to the Restoration Act's enactment, the

Supreme Court considered Pub. L. 280, which, among other things,

granted California broad criminal jurisdiction over offenses committed

by Indians but provided the State a more limited grant of civil

jurisdiction over tribal reservations.  480 U.S. at 207 (citing Pub. L. 280,

67 Stat. 588 (1953), which is codified as 18 U.S.C. § 1162).  To

determine whether conduct falls within a state's jurisdiction pursuant

to Pub. L. 280, the Supreme Court recognized a distinction between

"criminal/prohibitory" laws and "civil/regulatory" laws:

> if the intent of a state law is generally to prohibit certain
> conduct, it falls within Pub. L. 280's grant of criminal
> jurisdiction, but if the state law generally permits the conduct
> at issue, subject to regulation, it must be classified as
> civil/regulatory and Pub. L. 280 does not authorize its
> enforcement on an Indian reservation.

*Id.* at 209.  Consequently, if the Restoration Act incorporated

*Cabazon Band*'s criminal-prohibitory/civil-regulatory dichotomy,

then courts would consider whether Texas law permits the conduct

at issue, subject to regulation, or prohibits the conduct outright.

However, the Fifth Circuit determined that—even though some

discussion regarding *Cabazon Band* occurred on the House floor—

Congress as a whole did not intend to incorporate the criminal-prohibitory/civil-regulatory dichotomy into Restoration Act. *Ysleta I*, 36 F.3d at 1334–34. Instead, all gaming activities prohibited by Texas laws and regulations are prohibited by the Restoration Act. *Id.*

Ultimately, the Fifth Circuit determined that the Tribe's suit against the State was barred by Eleventh Amendment immunity. *Id.* at 1336–37. Therefore, the case was remanded with instructions that the district court dismiss the Tribe's suit. *Id.* at 1337.

2.  *Ysleta II*

In 1999, the State sued the Tribe and sought to enjoin gaming activities on the Pueblo reservation.[4] On September 27, 2001, summary judgment was granted in the State's favor. *Texas v. del Sur Pueblo* ("*Ysleta II*"), 220 F. Supp. 2d 668, 687 (W.D. Tex. 2001) (internal citations omitted), *modified* (May 17, 2002), *aff'd*, 31 F. App'x 835 (5th Cir. 2002), *and aff'd sub nom. State of Texas v. Pueblo*, 69 F. App'x 659 (5th Cir. 2003), *and order clarified sub nom. Texas v. Ysleta Del Sur Pueblo*, No. EP-99-CA-320-H, 2009 WL 10679419 (W.D. Tex. Aug. 4,

---

[4] Litigation proceeded under cause number EP-99-CV-320.

2009).  In his Memorandum Opinion, Judge Eisele determined that the

Tribe cannot engage in "'regulated' gaming activities unless it complies

with the pertinent regulations." *Id.* at 690.  The court determined that

the Tribe's activities did not comply with Texas's laws and regulations.

*Id.* at 695–96.  Moreover, the court considered equitable factors and

concluded that "[t]he fruits of [the Tribe's] unlawful enterprise are

tainted by the illegal means by which those benefits have been

obtained." *Id.* at 697.  Accordingly, the Tribe was permanently enjoined

from continuing its operations.  *Id.*  The injunction mandated that the

Tribe and those affiliated with it terminate, inter alia,

- "[A]ll card games; all dice games; all games using one or more balls and or a spinning wheel and games involving a vertical spinning wheel, which require players to pay a monetary fee;"

- "Gambling activities played with cards, dice, balls, Keno tickets, bingo cards, slot machines, or any other gambling device;"

- "Providing to any person for his/her use a slot machine;"

- "Conducting any gambling game from which any person or party enjoined herein is likely to receive any economic benefit other than personal winnings, including, but not limited to:  [] Bingo or any variation thereof. . . . "

Permanent Injunction, *Ysleta II*, No. EP-99-CV-320 (W.D. Tex. Sept. 27,

2001), ECF No. 115 at 3–5. The Fifth Circuit summarily affirmed Judge Eisele's opinion. *State v. del sur Pueblo*, 31 F. App'x 835 (5th Cir. 2002).

In May 2002, the injunction was modified to clarify that the Tribe may engage in legal gaming activities. Order Modifying September 27, 2001 Injunction, *Ysleta II*, No. EP-99-CV-320 (W.D. Tex. May 17, 2002), ECF No. 165. Judge Eisele stated that "[t]he Tribe is bound, through the terms of the Restoration Act, to adhere to Texas gaming law. Not all gaming activities are prohibited to the Tribe, only those gaming activities that are prohibited by Texas law to private citizens and other organizations." *Id.* at 16.

Significantly, the order modifying the injunction discussed charitable bingo. *Id.* at 14–17. In seeking modifications to the injunction, the Tribe sought to conduct charitable bingo without a license. *Id.* The Tribe averred that, because § 107(b) of the Restoration Act does not give Texas regulatory jurisdiction over the Tribe, the Tribe should be permitted to operate bingo that is regulated by the Tribe's own commission rather than by Texas's bingo commission. *Id.* at 15. However, Judge Eisele made clear that the Tribe must, like other

11

citizens, follow Texas gaming law. *Id.* Notably, Judge Eisele determined that the Tribe is not entitled to conduct bingo without a license because "the Tribe is subject to Texas gaming law on all matters, including participation in charitable bingo activities." *Id.*

## C. The Relevant Facts Regarding This Litigation

The facts in this case are undisputed.[5] The lawsuit centers around the Tribe's activities at Speaking Rock Entertainment Center [hereinafter "Speaking Rock"], which is the primary location for the Tribe's gaming activities.[6] The Tribe's gaming operations are a significant source of employment for the Pueblo people, and the Tribe uses the money raised at its casino to fund several important governmental initiatives, including education, healthcare, and cultural

---

[5] The Tribe asserts that "mixed question[s] of law and fact" exist in this case because it believes the State has "conflat[ed ] what is a law and what is a regulation." Resp. 9. However, the Tribe does not dispute the facts that the State has alleged regarding the gaming operations; instead, the Tribe challenges the conclusions that the State draws from the available facts.

[6] Although the majority of the Tribe's operations occur at Speaking Rock, the Tribe also operates a smaller number of machines at the Socorro Tobacco Outlet. *See* Mot. Ex. F (Hisa Dep. Tr.), at 11:16–12:12. Thus, although the Court will refer to the Tribe's operations as those at "Speaking Rock," the Court's discussion applies to the one-touch machines located at the Socorro Tobacco Outlet, as well.

preservation.  Resp. 6.  The Pueblo's operations are not conducted pursuant to any license from the Texas Lottery Commission.  Mot. Ex. K at 6.

On May 17, 2017, agents and attorneys representing Texas inspected Speaking Rock.  Mot. 3.  There, the State video-recorded the gaming operations at Speaking Rock and found that the Tribe operates stationary one-touch machines as well as live-called bingo.  *See generally* Mot. Ex. A.  The one-touch machines and live-called bingo are described below.

1. <u>One-Touch Machines</u>

The Pueblo operate more than 2,500 one-touch machines.  Mot. Ex. F (Hisa Dep. Tr.), at 11:16–12:12.  The one-touch machines, which are available for play twenty-four hours a day, seven days a week ("24/7"), are lined in rows:



Mot. Ex. A.  The machines have decorative outer wrapping and are

labeled with different names—e.g., "Big Texas Payday," "Welcome to Fabulous Las Vegas," "Kitty City," and "Lucky Duck." *Id.* The machines display lights, sounds, and graphics for the purposes of entertainment. Mot. Ex. C (Eclipse Dep. Tr.), at 38:11–17.

To initiate a session on a one-touch machine, a player inserts either cash or a ticket that represents a cash value into the machine. Mot. Ex. A. Although the machines look similar to a traditional "slot machine," the underlying game is run by using historical bingo draws. Resp. Ex. A (Eclipse Dep. Tr.), at 24:24–25. Players are assigned a bingo card based on an electronically maintained stack of cards. *Id.* at 32:24–33:2. On some machines (but not all), after the card is assigned, the player has the option to operate the touch screen and select a different card from the stack. *Id.* at 33:3–8; Mot. Ex. I (Am. Amusement Dep. Tr.), at 31:19–22.

The historical bingo cards are displayed in different locations on on the game screens, typically above or below the screen's graphics. Mot. Ex. A. For example, the "Big Texas Payday" design displays bingo cards on the top left corner of the screen:



*Id.* After selecting a card, the player presses a button, which represents the value that the player is betting during that session. *Id.* Then, the graphics on the screen move and the machine emits noise before displaying whether the player won any cash value. *Id.*

To determine if a player wins, the software applies a preset, historical ball draw to the card on the screen. Resp. Ex. A (Eclipse Dep. Tr.), at 34:25–35:3. If the player's card would have achieved a bingo based on the ball draw retrieved by the machine's software, then the player wins his session of play. *See id.* The Tribe provides historical ball draw data to the company that designs the software for the Tribe's one-touch machines, and the data is based on prior, actual (non-electronic) bingo ball pulls conducted at Speaking Rock. *Id.* at 35:10–16, 79:1–12. Because the machines are configured to run based on historical bingo ball draws, the Pueblo refer to the machines as "stationary cardminders." Resp. 8–9.

If a player wins, then the player may use the value won in order to

continue playing on that particular machine, print out a ticket reflecting a cash value and insert it into a different machine for play, or bring the ticket to a casino employee where he is entitled to exchange the ticket for its cash value.  Mot. Ex. A.

      2.    <u>Live-Called Bingo</u>

Additionally, the Pueblo operate 24/7 live-called bingo games in their "Sovereign Bingo Lounge."  *Id.*  To play, a player may purchase either paper or electronic bingo cards.  *Id.*  If a player uses a paper bingo card, then the player manually marks the cards to determine whether he has achieved a bingo.  *Id.*  However, the electronic, handheld cardminders have the capacity to track the player's cards for him and will notify the player if he wins.  *Id.*  Thus, with the aid of an electronic cardminder, a player at Speaking Rock is able to play dozens of cards at the same time on one machine.  The parties' briefing does not specify the precise number of cards that can be played on one electronic cardminding machine.  However, the Tribe admits that the number is more than sixty-six.  Mot. Ex. K.

## II.   LEGAL STANDARD

### A.   Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Rogers v. Bromac Title Servs., LLC*, 755 F.3d 347, 350 (5th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"Under Federal Rule of Civil Procedure 56(c), the party moving for summary judgment bears the initial burden of . . . 'identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "Rule 56(c) mandates the entry of summary judgment . . . upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 323.  Where this is the case, "there can be 'no genuine issue

as to any material fact,' since complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* (quoting Rule 56(c)).

In adjudicating a motion for summary judgment, a court "consider[s] evidence in the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in favor of that party." *Bluebonnet Hotel Ventures, LLC v. Wells Fargo Bank, N.A.*, 754 F.3d 272, 276 (5th Cir. 2014).

## III. ANALYSIS

Texas seeks a permanent injunction halting the Tribe's operations at Speaking Rock. The Tribe avers that it is not subject to the State's regulations. Resp. 13–15. Further, according to the Tribe, its operations at Speaking Rock are permissible forms of bingo. *Id.* at 15–17. For the reasons discussed below, the Court concludes that the Tribe is subject to the State's regulations. The Court also determines that the Tribe's operations violate Texas law. Finally, the Court is of the opinion that the Tribe should be enjoined from continuing its gaming operations at Speaking Rock.

## A. Whether the State may enforce Texas regulations against the Tribe in federal court

The Tribe's Response principally focuses on the interaction between subsections (a) and (b) of the Restoration Act. Section 107(a) provides:

> (a) IN GENERAL.—All gaming activities which are prohibited by the laws of the State of Texas are hereby prohibited on the reservation and on lands of the tribe. Any violation of the prohibition provided in this subsection shall be subject to the same civil and criminal penalties that are provided by the laws of the State of Texas. The provisions of this subsection are enacted in accordance with the tribe's request in Tribal Resolution No. T.C.-02-86 which was approved and certified on March 12, 1986.

According to the Tribe, the State has "failed to distinguish between what a law and what a regulation is." Resp. 3. The Tribe asserts that subsection (a) should be understood to convey that "Congress has confirmed the Pueblo's sovereign right to engage in all *gaming activity* not *prohibited by* the *laws of the State of Texas*." *Id.* at 4. The Pueblo's formulation of this provision is not a precise recitation of the Restoration Act's text. Subsection (a) does not affirmatively grant a right to engage in gaming; instead it prohibits illegal gaming.

Additionally, § 107(b) provides that, "Nothing in this section shall be construed as a grant of civil or criminal regulatory jurisdiction to the

State of Texas." The Tribe contends that subsection (b) demonstrates that "Congress has also confirmed that Texas' regulatory scheme cannot be applied by the Court to the Ysleta del Sur Pueblo." *Id.* at 5. However, although subsection (b) provides that Texas does not have "regulatory jurisdiction," subsection (b) does not provide that Texas's regulations are thus unenforceable against the Tribe in federal court. Importantly, the Tribe's formulation of subsection (b) does not reflect the Fifth Circuit's interpretation of the statute. Pursuant to *Ysleta I*, the Tribe is subject to Texas's regulations, and Texas may properly enforce its regulations in federal court.

Admittedly, the Restoration Act does not clearly define what "regulatory jurisdiction" means. However, in light of *Ysleta I*, there is no need to relitigate whether the Tribe must follow Texas regulations. Though an interpretation of subsection (b) that incorporated *Cabazon Band* would distinguish between laws that prohibit conduct and those that permit but merely regulate conduct, the Fifth Circuit rejected this view. The Court recognizes the Tribe's frustration that *Ysleta I* and subsequent case law interpreting *Ysleta I* do not clearly elucidate subsection (b)'s effect on tribal gaming. *See* Resp 14–15. Nonetheless,

the Court is bound by Fifth Circuit precedent and understands Fifth Circuit case law to require that the Tribe follow Texas gaming regulations.

The Fifth Circuit considered this issue in *Ysleta I* and determined that "Congress—and the Tribe—intended for Texas' gaming laws *and regulations* to operate as surrogate federal law on the Tribe's reservation in Texas." 36 F.3d at 1334 (emphasis added). In reaching its decision, the Fifth Circuit considered the legislative history and text of the Restoration Act. *Id.* The Fifth Circuit focused on the Tribe's commitment to prohibit all gambling on the Reservation, as memorialized in Tribal Resolution No. T.C.-02-86, which is incorporated by reference in § 107(a) of the Restoration Act. *Id.*

The Tribe asserts that the Fifth Circuit's decision that Texas's regulations operate as "surrogate federal law" should be disregarded because, according to the Tribe, the statement is dicta and was not fully considered when written. Resp. 14 n.16. The Tribe previously raised this argument in *Ysleta II* before Judge Eisele, and Judge Eisele rejected the Tribe's contention:

> The question before the court was: Which statutory scheme, IGRA or the Restoration Act, governed the Tribe's casino

21

operation?  And, to resolve that question, the Fifth Circuit had to first determine the effect of the Restoration Act's § 107. Only after determining § 107's effect could it then decide whether the Restoration Act and IGRA had an actual conflict. Once the court found conflict, it was forced to decide which statute to apply, and, in so doing, concluded that the Restoration Act, as the specific statute, was applicable.  Only after it decided that the Restoration Act applied could the court decide whether the Act had waived the State's sovereign immunity.  If the court had determined that IGRA applied, or that the Restoration Act and IGRA followed the same basic statutory scheme regarding gaming, the result of the case would have been different.  So the initial determination regarding the breadth of the Restoration Act's provisions on gaming was a necessary step toward the Court's final decision.  And that determination being necessary, it cannot be dicta.

*Ysleta II*, 220 F. Supp. 2d at 687.  Thus, Judge Eisele's reasoning supports that, because the Fifth Circuit needed to consider the breadth of the Restoration Act to make its decision, its determination that the State's regulations function as surrogate federal law is not dicta.

Significantly, even if it were dicta, the Fifth Circuit's decision would be highly persuasive.  The Fifth Circuit fully considered the Restoration Act's text and legislative history when determining whether the Tribe is subject to Texas's regulations via the Restoration Act, and no contrary opinion since then has been published by the Fifth Circuit.  Accordingly, the Court would afford the Fifth Circuit's thorough

reasoning great weight. *See, e.g., Sheet Metal Workers v. EEOC,* 478

U.S. 421, 490 (1986) ("Although technically dicta, . . . an important part

of the Court's rationale for the result that it reache[s] . . . is entitled to

greater weight . . . .") (O'Connor, J., concurring); *O'Dell v. N. River Ins.

Co.*, 614 F. Supp. 1556, 1559 (W.D. La. 1985) ("As always, dicta by one

panel stands as persuasive authority only, although it is entitled to

great weight absent a contrary holding in the circuit.").

In sum, the Fifth Circuit decided that the Tribe is subject to

Texas's gaming laws and regulations, which function as surrogate

federal law pursuant to the Restoration Act.[7]  Thus, the Tribe's

---

[7] The Court recognizes that the Pueblo and Alabama-Coushatta Tribes disagree with the Fifth Circuit's decision.  The Tribes have petitioned Congress to amend the law in order to provide either that the Tribes may conduct gaming as allowed by IGRA or that the *Cabazon Band* criminal-prohibitory/civil-regulatory dichotomy should be read into the Restoration Act's text.  *See, e.g., Oversight Hearing on the Implementation of the Restoration Act Before the S. Comm. on Indian Affairs*, 107th Cong. (2002).  The Tribes believe that courts have misinterpreted the Restoration Act's intended meaning.  *See id.* at 4 (statement of Kevin Battise, Tribal Council Chairman, Alabama-Coushatta Indian Tribe of Texas) (noting that the Member who discussed *Cabazon Band* in front of the House of Representatives prior to House approval of the Restoration Act was the chairman of the House Insular Affairs Committee and suggesting that the Fifth Circuit should have accorded his statement greater weight).  The Court notes that, although the Tribes have made Congress aware of their concerns, Congress has not yet amended the Restoration Act.  Thus, absent an act

insistence that Texas should only be able to enforce its laws, but not its regulations, conflicts with precedent.  Accordingly, the Court need not distinguish between laws and regulations, as the Court concludes that it must enforce both.

**B.  Whether the gaming activities at Speaking Rock are prohibited by Texas laws or regulations**

Next, the Court considers whether the gaming activities at Speaking Rock are barred by Texas gaming laws.  As Judge Eisele noted, "[n]ot all gaming activities are prohibited to the Tribe, only those gaming activities that are prohibited by Texas law to private citizens and other organizations."  Order Modifying September 27, 2001 Injunction, *Ysleta II*, No. EP-99-CV-320 (W.D. Tex. May 17, 2002), ECF No. 165 at 3–5.  Accordingly, determining whether the Pueblo operations are legal under Texas state law, which is federalized by the Restoration Act, requires careful consideration of Texas's statutory and regulatory scheme.

1.  <u>Texas Gaming Law</u>

Two sources of Texas law are principally relevant here:  first, the

---

of Congress, the Fifth Circuit's interpretation of the Restoration Act, as articulated in *Ysleta I*, controls the Court's decision.

Bingo Enabling Act and, second, Texas's Charitable Bingo Administrative Rules. Below, the Court describes the relevant provisions of each scheme. Then, the Court considers whether the Tribe's operations at Speaking Rock comply with Texas law.[8]

### a) Bingo Enabling Act

Pursuant to the Bingo Enabling Act, bingo may be conducted by authorized charitable organizations. *See generally* TEX. OCC. CODE § 2001. "Bingo" is "a specific game of chance, commonly known as bingo or lotto, in which prizes are awarded on the basis of designated numbers or symbols conforming to randomly selected numbers or symbols." *Id.* § 2001.002(4). In most circumstances, unlicensed bingo is a third-degree felony.[9] *Id.* § 2001.551.

---

[8] The Tribe seeks declarations that "bingo is a gaming activity" and that "the laws of the State of Texas do not prohibit bingo." Pueblo Defs.' First Am. Counterclaim 23, Sept. 7, 2018, ECF No. 121. Bingo is a gaming activity. However, the Court cannot accurately assert that Texas laws "do not prohibit" bingo. Instead, charitable bingo is allowable in some circumstances; however, it is illegal when it fails to conform with Texas's complex statutory and regulatory scheme.

[9] However, it is not a felony to conduct: small bingo games in a person's home for nominal prizes, bingo in a senior citizens' center or hospital for entertainment, or bingo for radio or television promotions as long as the participants are not required to pay to play. *Id.* § 2001.551.

Limitations exist on the duration and frequency of bingo occasions.[10] An organization may only conduct three bingo occasions per week, and each occasion may not exceed four hours. *Id.* § 2001.419(a), (b). Typically, no more than two bingo occasions may be conducted per day. *Id.* § 2001.419(c).

Additionally, the Bingo Enabling Act provides a detailed scheme regarding the use of bingo equipment employed as an aid to bingo. "Bingo equipment" is defined as:

> (i) a machine or other device from which balls or other items are withdrawn to determine the letters and numbers or other symbols to be called; (ii) an electronic or mechanical cardminding device; (iii) a pull-tab dispenser; (iv) a bingo card; (v) a bingo ball; and (vi) any other device commonly used in the direct operation of a bingo game[.]

*Id.* § 2001.002(5)(A). Bingo equipment may be used; however, the equipment must be supplied by licensed manufacturers and distributers. *Id.* § 2001.407.

Moreover, the Act provides specific limitations regarding the use

---

[10] "'Bingo occasion' means a single gathering or session at which a bingo game or a series of bingo games, including selling and redeeming pull-tab bingo tickets, are conducted on the day and at the times listed on the license issued to a licensed authorized organization." *Id.* § 2001.002(6).

of cardminding devices:

> A person may not use a card-minding device: (1) to generate or determine the random letters, numbers, or other symbols used in playing the bingo card played with the device's assistance; (2) as a receptacle for the deposit of tokens or money in payment for playing the bingo card played with the device's assistance; or (3) as a dispenser for the payment of a bingo prize, including coins, paper currency, or a thing of value for the bingo card played with the device's assistance.

*Id.* § 2001.409.

### b) *Charitable Bingo Administrative Rules*

The Texas Administrative Code further defines the term

"cardminding device" as:

> A device used by a player to monitor bingo cards played at a licensed authorized organization's bingo occasion and which: (i) provides a means for the player to input or monitor called bingo numbers; (ii) compares the numbers entered or received against the numbers on the bingo cards stored in the memory of the device or loaded or otherwise enabled for play on the device; and (iii) identifies any winning bingo pattern(s) and prize levels.

TEX. ADMIN. CODE § 402.321. Players may use electronic cardminders,

but any electronic cardminder may only play up to sixty-six cards at a

time. *Id.* § 402.322(r).

Additionally, before a manufacturer furnishes a cardminding

system to a bingo licensee, the system must have "first been tested and

certified as compliant with the standards in [§ 402.324 of the Administrative Code] by an independent testing facility or the Commission's own testing lab." *Id.* § 402.324.

## 2. The Tribe's Operations

Next, the Court considers whether the Tribe's one-touch machines and live-called bingo comply with Texas law and, correspondingly, the Restoration Act. Notably, the Tribe has not obtained a license to conduct bingo from the Texas Lottery Commission, as required by the Bingo Enabling Act.

First, the Court determines whether the Pueblo's one-touch machines comply with the Bingo Enabling Act and Texas Administrative Code's requirements for electronic cardminders. Admittedly, the Tribe's one-touch machines look and sound like Las-Vegas-style slot machines. However, Texas law does not focus on how bingo equipment looks and sounds to determine whether it is legal. Instead, the law defines what may or may not be considered a legal cardminding device. For the reasons discussed below, the one-touch machines—although cleverly designed to select winners based on historical bingo pulls—fail to comply with Texas's scheme.

Pursuant to the Bingo Enabling Act, a cardminding device may not be used "to generate or determine the random letters, numbers, or other symbols used in playing the bingo card played with the device's assistance." TEX. OCC. CODE § 2001.409(a)(1). Philip Sanderson, who previously worked for the State and participated in drafting the rules regarding cardminding devices, testified about the Tribe's machines. Resp. Ex. B (Sanderson Dep. Tr.), at 19:14–20:2. Based on his knowledge of the machines and understanding of the regulations, Mr. Sanderson opined that "[n]either the server nor the individual cardminding device contain a random number generator." *Id.* at 28:17–39:3. Specifically, because the software is configured to select the next bingo card from an electronically maintained stack of cards, rather than randomly choosing a card, Sanderson believes that the machine does not generate nor determine any random outcome. *Id.* The Court finds Mr. Sanderson's testimony to be persuasive and does not believe that the one-touch machines are random number generators.

Although the Court believes that the Tribe's machines do not randomly generate numbers, the one-touch machines fail to comply with other provisions in the Bingo Enabling Act. Specifically, the Bingo

29

Enabling Act prohibits a cardminding device from being used "as a receptacle for the deposit of tokens or money in payment for playing the bingo card played with the device's assistance" or as "as a dispenser for the payment of a bingo prize, including coins, paper currency, or a thing of value for the bingo card played with the device's assistance." TEX. OCC. CODE § 2001.409(a)(2), (3). Here, a game session on a one-touch machine is initiated by inserting either cash or a cash-value voucher into the machine. After the game session concludes, the machines provide a voucher that represents a cash value to players who have won the game. Accordingly, the one-touch machines do not comport with the Bingo Enabling Act's requirements for bingo cardminding devices.

In contrast to the one-touch machines, the Tribe's live-called bingo looks and sounds like traditional, preconceived notions of bingo. However, the Tribe's cardminders enable a participant to play more cards than Texas's regulations permit. The Texas Administrative Code only allows electronic cardminding machines to monitor up to sixty-six cards at one time; however, the Tribe has admitted that its machines allow players to play more than sixty-six cards.

Moreover, any cardminding device must be tested by an

independent testing facility or the Commission's own testing lab in order to evaluate the machine's compliance with Texas law. The Tribe's software and devices are tested by an independent facility. Mot. Ex. M. However, the facility does not evaluate the machines for compliance with Texas law; instead, the facility has been provided different standards that are promulgated by the Pueblo Regulatory Commission. *See id.* (depicting the standards that the Pueblo Regulatory Commission provided to the testing facility). Therefore, the Tribe's machines are not properly tested for compliance with Texas state law.

Additionally, the Pueblo's operations exceed the scope of any bingo authorized by the Bingo Enabling Act. The Act allows for bingo to be conducted during four-hour sessions, three times per week. The Tribe's use of the machines and live-called bingo—which are available 24/7— far exceed the volume of charitable bingo authorized by Texas law.

In sum, the Court is of the opinion that the Tribe's bingo operations fail to comply with Texas law.

## C.    Whether an injunction should be issued

"The party seeking a permanent injunction must meet a four-part test. It must establish: (1) success on the merits; (2) that a failure to

grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest." *VRC LLC v. City of Dallas*, 460 F.3d 607, 611 (5th Cir. 2006). "Injunctive relief is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985). Thus, "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

### 1. Success on the Merits

As discussed above, Texas has proven success on the merits. Specifically, Texas has shown that the Tribe's activities at Speaking Rock fail to comport with Texas law and regulations, which have been federalized via the Restoration Act. Although Texas has demonstrated success on the merits, "[a]n injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008).

Accordingly, the Court next considers the other, equitable elements that must be met to issue an injunction.

## 2. Irreparable Harm

"In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) (citing *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B 1981); *Parks v. Dunlop*, 517 F.2d 785, 787 (5th Cir. 1975)); *see also ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 694 (N.D. Tex. 2015) ("An injury is generally considered to be irreparable if the injury cannot be undone through monetary relief." (citing *Enterprise International, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472–73 (5th Cir. 1985))).

In this case, monetary damages are inadequate because the State cannot seek them. The Restoration Act provides the State a single remedy: seeking an injunction in federal court. *See* Restoration Act § 107(c). Thus, if the Court were to determine that no injunction should be entered, the State would have no alternative course of action to enforce Texas law via the Restoration Act. Accordingly, no adequate

remedy at law exists, and the Court is of the opinion that the State would suffer irreparable harm in the absence of an injunction.

Additionally, the State avers that it suffers irreparable injury when it is "prevented from enforcing its laws." Mot. 19. On this point, Texas cites cases holding that states suffer irreparable injury when enjoined from enforcing their laws. *Id.* (citing *Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013) ("When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws.")). The Tribe notes that the cases the State relies on are not directly applicable here.[11] Resp. 20. In this case, no party seeks to enjoin the State from enforcing its laws; instead the State itself is

---

[11] Further, the Tribe contends that "[r]equiring the State to prove the merits of its case, rather than through disfavored injunctive relief, is not 'irreparable harm.'" Resp. 20. Although the Tribe's argument lacks clarity, it appears that the Tribe believes that the State seeks to achieve an injunction without demonstrating success on the merits. That belief is incorrect. The Court notes that this factor—irreparable harm—is required *in addition to* success on the merits.

pursuing an injunction against the Tribe.  *Id.*

As a formal matter, being enjoined from enforcing laws is different than seeking an injunction against a party that is breaking the law. This is especially true because of the sweeping scope of an injunction that prevents a state from enforcing its laws.  In this case, if an injunction were not issued, the State's gaming law would not be wholly ineffective.  Although Texas's gaming law would be unenforceable as to the Tribe, any harm that Texas would face from denying the public the enforcement of its laws would be more limited in scope than the type of broad-sweeping injunction at issue in *Planned Parenthood*.

However, as a practical matter, the interest protected in this case is the same:  if the State is unable to enjoin the Tribe's gaming operations, then the State will be unable to seek other recourse so that it may effectively enforce its laws against the Tribe.  The State and its citizens have an interest in enforcing State law, and seeking an injunction is the only way that the State may enforce its gaming law on the Pueblo reservation.  Thus, in this case, due to the lack of other available remedies, the State's interest in enforcing its laws would be irreparably impaired if it cannot obtain an injunction against the Tribe.

In sum, the Court determines that the State has shown irreparable harm because, in the absence of an injunction, the State is unable to enforce Texas's gaming laws on the reservation as provided by the Restoration Act.

### 3. Balance of Equities & Public Interest

Because the parties are sovereigns who represent their respective constituents, the balance of equities and public interest are congruent: the Texas citizenry's interests align with the State's interest in enforcing its laws, and the Pueblo community's interest aligns with the Tribe's interests in maintaining its operations at Speaking Rock. Accordingly, the Court will analyze these factors together.

The Pueblo community relies on Speaking Rock to fund important governmental initiatives. As the Court noted in its March 29, 2018, "Order Regarding Magistrate's Report and Recommendation and Plaintiff's Application for Preliminary Injunction" (ECF No. 77) [hereinafter "Order Regarding R. & R."], courts have considered the importance of tribal self-governance and the impact of income lost by gaming when balancing the equities of a case. *See Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001)

(factoring in "the prospect of significant interference with tribal self-government" to the balance of the equities); *Seneca-Cayuga Tribe of Oklahoma v. State of Okla. ex rel. Thompson*, 874 F.2d 709, 716 (10th Cir. 1989) (finding that the balance of equities tipped in favor of a tribe because the tribe stood to "lose income used to support social services for which federal funds have been reduced or are non-existent, and lose jobs employing Indians who face a [high] rate of unemployment").

Admittedly, neither of the aforementioned cases perfectly reflect the case at hand, specifically because the tribes in *Prairie Band* and *Seneca-Cayuga* did not seek to engage in illegal activity on their reservations. In *Prairie Band*, the Tribe enacted its own motor vehicle code and, seeking to have the State recognize its vehicle registrations, sued the State of Kansas. 253 F.3d at 1239. In affirming a preliminary injunction, the Tenth Circuit considered that tribes have an interest in self-governance and that registering vehicles is a governmental function. *Id.* at 1250–51.

*Seneca-Cayuga* raised an issue more similar to this case: two Tribes filed a federal action to enjoin a pending state-court suit in which Oklahoma sought to halt the Seneca-Cayuga and Quapaw Tribes from

conducting bingo. 874 F.2d at 710. The Tenth Circuit determined that the Tribes were likely to prevail on the merits. *Id.* at 716. Accordingly, the court of appeals upheld a preliminary injunction because the Tribes faced a significant loss of tribal income and interference in self-government. *Id.* The State's interest—especially considering its low likelihood of success on the merits—did not outweigh the Tribes' interest. *Id.*

In this case, for similar reasons to those discussed in *Seneca-Cayuga*, the Court declined to grant a preliminary injunction during an earlier stage of this litigation. Order Regarding R. & R. 40–43. Specifically, the Court determined that the State had not shown a sufficient likelihood of success on the merits at the preliminary injunction stage. *Id.* at 28–38. Without a clear demonstration of success on the merits, a preliminary injunction would unnecessarily impair the Tribe's self-governance. *Id.* However, the Court noted that it would "ultimately base its decision [regarding a permanent injunction] on the legality of the bingo machines at issue" and that the "revenue from Speaking Rock does not entitle Defendants to engage in illegal activity." *Id.* at 43 n.14.

Presently, the State has shown success on the merits.  Therefore, although the Tribe has an interest in self-governance, the Tribe cannot satisfy that interest by engaging in illegal activity.  Further, the Court cannot decline to enforce the Restoration Act, which is federal law.  As Judge Eisele stated in 2001,

> [T]he Pueblo and its members, and others, have benefitted enormously from the Pueblo's illegal gambling operations, but this circumstance can not justify the clear violation of law. The fruits of this unlawful enterprise are tainted by the illegal means by which those benefits have been obtained.
>
> Under the law the court believes it has no choice but to enjoin the continued operation of this widespread common and public nuisance.[12] But, even assuming the court has some discretion in the matter, it concludes that it would be an abuse of that discretion not to enjoin the gaming and gambling activities under the circumstances of this case.
>
> What the Defendants characterize as "equities" in this

---

[12] The Court notes that, even though the Texas Remedies Code codifies a violation of gambling laws as a "common and public nuisance," *see* TEX. CIV. PRAC. & REM. CODE § 125.0015, the State does not suggest that the community considers Speaking Rock to be a nuisance of any sort. *See* Resp. Ex. F at 14–15.  To the contrary, the Tribe has submitted evidence demonstrating that the community supports Speaking Rock and believes that Speaking Rock is a valuable community asset.  Resp. Ex. I (collecting letters expressing community support).  However, regardless of the chapter's title, Texas law does not require the State to prove that the Tribe's actions would be considered a nuisance based on general tort principles.  Instead, the Texas statute provides a remedy for any gambling violation "as prohibited by the Penal Code."  TEX. CIV. PRAC. & REM. CODE § 125.0015(a)(5).  Thus, Texas law considers illegal gambling to be a nuisance per se even if the community does not.

case are not such in the eyes of the law.  They are matters
which might, however, be brought to the attention of the
Congress of the United States or the legislature of the State
of Texas.

*Ysleta II*, 220 F. Supp. 2d at 697.  Accordingly, because the Tribe's

operations run contrary to Texas's gaming law, the balance of equities

weighs in favor of the State.

In sum, the State has shown (1) success on the merits, (2)

irreparable harm if no injunction is issued, (3) the balance of equities

favors the State, and (4) an injunction would serve the public interest.

Moreover, the Court is bound by the Restoration Act's text, as well as

the Fifth Circuit's interpretation of the Act.  Accordingly, the Court

must enjoin the Tribe's gaming activities, which violate Texas law.

The Court is cognizant than an injunction will have a substantial

impact on the Pueblo community.  Accordingly, the Court joins the

refrain of Judges who have urged the Tribes bound by the Restoration

Act to petition Congress to modify or replace the Restoration Act if they

would like to conduct gaming on the reservation.  *See Texas v. Alabama*

*Coushatta Tribe of Texas*, 298 F. Supp. 3d 909, 925 (E.D. Tex. 2018)

(stating that "[t]he plain language of the Restoration Act stands, as does

the Fifth Circuit's undisturbed interpretation of the application of that

Act" and that "[u]ntil Congress can be persuaded to amend or repeal the Restoration Act, . . . the Tribe must conform to the gaming laws and regulations of Texas").

Finally, the Court believes that, prior to entering a permanent injunction, the Court should receive input from the parties regarding the precise language of the injunction. As the Tribe has noted, an injunction may not simply command that a party "follow the law." Resp. 18. Instead, an injunction must be specific and state its terms in reasonable detail. Fed. R. Civ. P. 65(d). Thus, the Court invites each party to submit a proposed permanent injunction for the Court's consideration by March 1, 2019. Thereafter, the Court will consider the submissions, if any, and enter an injunction regarding the Tribe's operations.

## IV. CONCLUSION

Accordingly, **IT IS ORDERED** that the State of Texas's "Motion for Summary Judgment and Permanent Injunction" (ECF No. 146) is **GRANTED**.

**IT IS FURTHER ORDERED** that the **March 4, 2019**, trial setting in this matter is **VACATED**.

**IT IS FINALLY ORDERED** that, in light of this Memorandum Opinion, each party may draft and submit a proposed permanent injunction, if it so chooses, by **March 1, 2019, at 5:00 p.m. Mountain Time**.

**SIGNED** this **14th day** of **February, 2019**.

_____
**PHILIP R. MARTINEZ**
**UNITED STATES DISTRICT JUDGE**